948 A.2d 1272

CAROL BEDFORD AND H. PAUL BEDFORD, HER HUSBAND, PLAINTIFFS–RESPONDENTS, v. ANTHONY L. RIELLO, D.C., PETER E. LOWENSTEIN, D.C. AND COASTAL CHIROPRACTIC, DEFENDANTS–APPELLANTS.

Argued March 25, 2008—Decided June 18, 2008.

*Mary Ann Nobile Wilderrotter* argued the cause for appellants (*Ronan, Tuzzio & Giannone,* attorneys; *Lauren H. Zalepka,* on the briefs).

*Danielle S. Chandonnet* argued the cause for respondents (*Shebell & Shebell,* attorneys; *Thomas F. Shebell,* III, of counsel).

*John W. Leardi* submitted a brief on behalf of amicus curiae Association of New Jersey Chiropractors (*Buttaci & Leardi,* attorneys; *Jeffrey B. Randolph,* of counsel; *Mr. Leardi and Vincent N. Buttaci,* on the brief).

Justice LONG delivered the opinion of the Court.

The essential question presented in this appeal is whether the adjustment of an extremity—in this case a knee—falls within the permitted scope of chiropractic practice under New Jersey law. More particularly, the issue is whether adjustment of a knee is within the contemplation of *N.J.A.C.* 13:44E–1.1(a), which allows for chiropractic manipulation of the "articulations of the spine and related structures." The trial judge held, as a matter of law, that a knee is always a "related structure" under the rule. The Appellate Division disagreed concluding, also as a matter of law, that a knee can never be considered a "related structure" because *N.J.S.A.* 45:9–14.5 limits chiropractic practice to manipulation of "the articulations of the spinal column." We decline to adopt either view. An extremity is neither never nor always a related structure. Under the laws governing chiropractic practice, the issue in every case is whether a condition of the extremity manipulated is logically connected, by cause or effect, to a spinal condition. If it is, the practice is legitimate; if not, it exceeds the authorized scope of chiropractic. The question is one of fact to be resolved on a case-by-case basis.

I

In July 2001, plaintiff Carol Bedford filed a malpractice action against defendants, Drs. Anthony Riello and Peter Lowenstein

(collectively defendants). Plaintiff's complaint alleged that she sustained injuries as a result of defendants' negligent adjustments of her knee.

In an *in limine* motion on the eve of trial, plaintiff sought to introduce testimony that the statute, *N.J.S.A.* 45:9–14.5, and regulation, *N.J.A.C.* 13:44E–1.1, that govern the practice of chiropractic in New Jersey prohibit adjustment of a patient's knee and sought to bar defendants from producing witnesses to the contrary. Because plaintiff's complaint and interrogatory answers had not asserted that defendants violated the statute, the judge refused to consider that argument. However, plaintiff had claimed a violation of the regulation during discovery, and thus, the judge addressed whether the scope of chiropractic practice under the regulation permits adjustment of the knee.

Noting that the plain language of *N.J.A.C.* 13:44E–1.1(a) includes adjustment of the spine and "related structures," the judge held that the regulation is broad enough to include adjustment of extremities, such as the knee. Having determined the scope of "related structures" as a matter of law, the judge also held that plaintiff's witnesses could not testify that the term "related structures" means only the sacroiliac, occiput, and rib heads, as plaintiff had proffered. The matter proceeded to a trial at which the following evidence was adduced.

Dr. Lowenstein treated plaintiff numerous times for lower-back and hip complaints. Dr. Riello shared an office with Dr. Lowenstein and also occasionally treated plaintiff. According to plaintiff, on December 28, 1999, she was seen by Dr. Riello because Dr. Lowenstein was on vacation. She told Dr. Riello that she was experiencing pain in her right hip and in her left knee. Dr. Riello adjusted plaintiff's back and then proceeded to adjust her knee by draping her left leg over his forearm and "push[ing] down ... like a lever." Plaintiff testified that she "heard a pop and [felt a] burning immediately." When plaintiff got off of the examination table, her knee throbbed, burned, and "hurt[ ] ... very badly."

Plaintiff told Dr. Riello that she was experiencing pain and he responded that she should put ice on her knee.

Plaintiff saw Dr. Lowenstein after he returned from vacation. At that appointment, plaintiff complained that Dr. Riello had adjusted her knee. Dr. Lowenstein responded that he would have done the "exact same thing." Plaintiff testified that Dr. Lowenstein then adjusted her back, hips, and knee; that she experienced pain during that adjustment as well; and that she again heard a popping sound. In July 2001, plaintiff underwent arthroscopic surgery to repair a torn meniscus in her left knee. She underwent surgery again in October 2001 to remove a cyst from behind the same knee.

Plaintiff introduced expert testimony from Dr. Robert McCutcheon, a chiropractor, who had been prohibited from testifying that knee adjustment falls outside the scope of chiropractic. He opined that defendants deviated from the standard of care by failing to properly examine plaintiff and by failing to identify any "subluxation" of the knee that required adjustment. He explained that a "subluxation" occurs when the connection between two bones "is not functioning properly" so that they are "fixed" in place.[1] Dr. McCutcheon described the procedure that Dr. Riello used as "probably the most forceful manipulation of any joint in the body." On cross-examination, Dr. McCutcheon acknowledged that Dr. Riello's technique was proper, assuming adjustment was required.

Dr. Riello testified that he adjusted Plaintiff's knee "so that it doesn't affect anything in the spine." He explained that the adjustment corrected a "posterior tibial subluxation" that was related to plaintiff's knee pain. Further, according to Dr. Riello, the procedure he used to adjust plaintiff's knee did not involve pressure and posed no risk of meniscal tear.

---

[1] Stedman's Medical Dictionary defines "subluxation" as "an incomplete luxation or dislocation; though a relationship is altered, contact between joint surfaces remains." *Stedman's Medical Dictionary* 1356 (5th unabridged lawyers' ed.1982).

Dr. Lowenstein denied having adjusted plaintiff's knee. He also testified that, although a chiropractor's "focus is always on the spine," they "are licensed to check and align subluxations of the spine and associated articulations."

The defense also introduced expert testimony by Dr. Philip Santiago, a chiropractor who previously served on the Board of Chiropractic Examiners. He testified that chiropractors routinely adjust extremities, including the knee, and that such adjustments are appropriate because there is a "kinetic linkage" between the extremities and the spine. Dr. Santiago explained that a knee adjustment is a benign procedure that carries no complications or risks, and that the procedure cannot cause meniscal tears. He also explained that knee adjustments normally cause popping sounds, which result from "gas bubbles break[ing]" when the joint is pulled apart.

A jury returned a verdict in defendants' favor which plaintiff appealed, focusing on the *in limine* ruling. In a published opinion, the Appellate Division reversed. Looking to the language of *N.J.S.A.* 45:9–14.5 for guidance in interpreting the regulation, the panel concluded that, as a matter of law, the practice of chiropractic is confined to adjustments of the articulations of the spinal column and does not include adjustment of the extremities. *Bedford v. Riello,* 392 *N.J.Super.* 270, 280–81, 920 *A.*2d 693 (App.Div.2007). The panel went on to hold that the trial judge should have instructed the jury that knee adjustment is outside the scope of legitimate chiropractic practice and, as such, could be considered evidence of negligence. In light of its ruling, the court remanded the case for a new trial.

We granted defendants' petition for certification. 192 *N.J.* 481, 932 *A.*2d 31 (2007).

## II

Defendants' essential argument is that the Appellate Division erred in its conclusion that chiropractors are prohibited from

adjusting a patient's extremities, specifically knees. Relying on the plain language of *N.J.A.C.* 13:44E–1.1(a), they argue that chiropractic practice includes "adjustment and/or manipulation of the articulations of the spine and *related structures.*" (Emphasis added).

Further, defendants contend that, even if the Appellate Division's decision is upheld, it should only be applied prospectively because members of the chiropractic community relied on the regulation in concluding that extra-spinal adjustments are permissible. As such, retrospective application of the panel's interpretation would be unjust because it would subject chiropractors to malpractice suits and claims by insurers, who will seek reimbursement for unauthorized services.

As might be expected, the Association of New Jersey Chiropractors, as *amicus curiae,* mirrors defendants' views, adding only that the Appellate Division effectively invalidated *N.J.A.C.* 13:44E–1.1(a) when it held that the regulation's "related structures" language does not permit extra-spinal manipulation.

Plaintiff counters that the Appellate Division correctly ruled that the Legislature intended to preclude chiropractors from performing extra-spinal adjustments. To support that argument, plaintiff looks to the plain language of *N.J.S.A.* 45:9–14.5 which defines chiropractic as limited to the "adjust[ment of] the articulations of the spinal column" and argues that any change in that definition must come from the Legislature. Although the parties notified the Attorney General of the pendency of the case before us pursuant to *Rule* 4:28–4, the Attorney General has not entered an appearance.

### III

A brief history of chiropractic regulation in New Jersey is our starting point. The practice first became regulated in 1920. Act to Regulate the Practice of Chiropractic, *L.* 1920, *c.* 4. Although the scope of practice and the body overseeing that regulation have undergone change, the practice of chiropractic has been continu-

ously regulated since that time. The original Act defined chiropractic holistically as

> the study and application of a universal philosophy of biology, theology, theosophy, health, disease, death, the science of the cause of disease and art of permitting the restoration of the triune relationships between all attributes necessary to normal composite forms, to harmonious quantities and qualities by placing in juxtaposition the abnormal concrete positions of definite mechanical portions with each other by hand, thus *correcting all subluxations of the articulations of the spinal column,* for the purpose of permitting the recreation of all normal cyclical currents through nerves that were formerly not permitted to be transmitted, through impingement, but have now assumed their normal size and capacity for conduction as they emanate through inter vertebral foramina—the expressions of which were formerly excessive or partially lacking—named disease.
>
> [*L.* 1920, *c.* 4, § 1 (emphasis added).] [2]

In 1953, the Legislature amended the statutory definition of chiropractic to its current pithy version: "A system of adjusting the articulations of the spinal column by manipulation thereof." *N.J.S.A.* 45:9–14.5.

In 1984, the State Board of Medical Examiners (SBME), then the agency in charge of chiropractic regulation, promulgated regulations further defining the practice of chiropractic. In so doing, it observed that it has "been judicially noted [that] the Legislature ... has not established the scope of authorized practice for this profession, instead preferring that it be specified by the Board." 16 *N.J.R.* 686(a) (Apr. 2, 1984) (citing *In re Sherman Coll. of Straight Chiropractic,* 164 *N.J.Super.* 519, 525, 397 *A.*2d 362 (App.Div.1979)). The SBME further noted "the appropriateness of delineating standards of conduct by rule ...," "to provide the public and Board licensees with the Board interpretation of the brief definition of the practice of chiropractic contained in *N.J.S.A.* 45:9–14.5." *Ibid.* (citing *Crema v. N.J. Dep't of Envtl. Prot.,* 94 *N.J.* 286, 299, 463 *A.*2d 910 (1983)). The SBME promulgated *N.J.A.C.* 13:35–7.1, the predecessor of the regulation at issue in this appeal, which set forth the scope of chiropractic as

---

[2] Stedman's defines an articulation as an "articulation," "the place of union, usually more or less movable, between two or more bones." *Stedman's Medical Dictionary* 126–27 (5th unabridged lawyers' ed.1982).

that discipline whose methodology is the adjustment and *manipulation of the articulations of the spine and related structures* and whose purpose is the relief of certain abnormal clinical conditions of the human body causing discomfort resulting from the impingement upon associated nerves.

[16 *N.J.R.* 3208(a) (Nov. 19, 1984) (emphasis added).]

The regulation further provided that chiropractic treatment is only authorized when the chiropractic physician identifies a "clinical condition" that causes "patient discomfort" and that "a finding of subluxation alone or subluxation unrelated to the subjective complaint shall not warrant chiropractic treatment." *Ibid.* The SBME further defined "subluxation" as the "alteration of normal dynamics of the anatomical or physiological relationships of contiguous articular structures." *Ibid.* In enacting that rule the SBME specifically noted that it did not expand current practice but "merely codifi[ed] long-standing Board interpretation of the pertinent statutes." 16 *N.J.R.* 3209 (Nov. 10, 1984).

In 1989, the Legislature passed the "Chiropractic Board Act," which transferred responsibility for the licensing of chiropractors to the new State Board of Chiropractic Examiners (Board). *N.J.S.A.* 45:9–14.5; *N.J.S.A.* 45:9–41.4 to –41.27; *see also Del Tufo v. Manon–Rossi,* 277 *N.J.Super.* 198, 205, 649 *A.*2d 411 (App.Div. 1994) (stating purpose of Act was to establish Board of Chiropractic Examiners and vest it with regulatory authority). Despite the regulation regarding "related structures" that Act left unchanged the statutory definition of chiropractic adopted in 1953. The Act provided, however, that "[t]he scope of practice of chiropractic shall remain as defined in existing statutes," *N.J.S.A.* 45:9–41.27, and that the "[l]aws of this state relating to the practice of chiropractic and not amended by, or inconsistent with, this act shall remain in effect." *N.J.S.A.* 45:9–41.26.

The Act specifically overturned the regulatory requirement that a patient present a "clinical condition[ ] . . . causing discomfort" before chiropractic care could be rendered, as required by the former *N.J.A.C.* 13:35–7.1. Instead, the Act provided:

Nothing in this act shall be deemed to prohibit a chiropractor from caring for chiropractic subluxation as determined by chiropractic analytical procedures. Chi-

ropractic analysis which identifies the existence of a subluxation may be the only basis for chiropractic care.

[*N.J.S.A.* 45:9–41.27.]

The Act did not alter or otherwise affect the "related structures" regulation, and the laws governing chiropractic were again amended in 1990, *L.* 1990, *c.* 68, without any change in that regulation.

In 1991, the Board revised the regulations governing the practice of chiropractic. *N.J.A.C.* 13:44E–1.1 to –3.11. Among those regulations, the Board adopted *N.J.A.C.* 13:44E–1.1(a), entitled "Scope of Practice" which reaffirmed the 1984 regulation regarding manipulation of the spine and "related structures":

The practice of chiropractic is that patient health care discipline whose methodology is the adjustment and/or manipulation of the articulations of the spine and *related structures.* ... Nothing herein contained shall be deemed to prohibit a licensee from caring for chiropractic subluxation as determined by chiropractic analytical procedures. Chiropractic analysis which identifies the existence of a subluxation may be the basis for chiropractic care even in the absence of a subjective complaint or other objective findings.

[ (Emphasis added).]

The Board originally proposed that regulation on July 15, 1991. 23 *N.J.R.* 2100(a) (July 15, 1991). At that time, it invited public comment which was later published. 24 *N.J.R.* 642(a) (Feb. 18, 1992). Among the comments and responses published, the Board addressed the meaning of the "related structures" clause that had been in effect since 1984:

COMMENT: Two commenters requested that the Board expand the scope of practice to include all joints and bones of the body....

RESPONSE: The [Board] may promulgate rules only to the extent authorized by statute. The enabling legislation limits the practice of chiropractic to the spinal column. Accordingly, the requested expansion of scope of practice would be beyond the delegated authority of the Board to implement.

. . . .

COMMENT: Several commenters suggested that the first sentence of the proposal which defines the scope of practice to include the spine and related structures was too vague and that "related structures" should be more specifically defined.

RESPONSE: The Board believes that the rule does not require further clarification in that *it is consistent with prior practice and has been understood and interpreted in the past to naturally include the biomechanic and neurologic systems which impact on the spine.*

[24 *N.J.R.* 642(a)–643 (Feb. 18, 1992) (emphasis added).]

The final version of the regulation reiterated the "related structures" language. *N.J.A.C.* 13:44E–1.1(a). In 1993, when the chiropractic statute was again amended, the definition and scope of practice provisions of the statute were left unaltered. *L.* 1993, *c.* 90. Since then, the Board has readopted the regulations codified in *N.J.A.C.* 13:44E on three separate occasions without amending the scope of practice regulation. 28 *N.J.R.* 3803(b) (Aug. 5, 1995); 33 *N.J.R.* 2683(a) (Aug. 6, 2001); 39 *N.J.R.* 656(a) (Feb. 20, 2007).

Over the years following the adoption of the scope of practice regulation, the Board has addressed the "related structures" language on multiple occasions during public sessions. The Board's responses to practitioners' inquiries were recorded in meeting minutes that were reviewed, amended where necessary, and approved at later public sessions. The responses are published on the Board's website. *See* State Board of Chiropractic Examiners, Minutes Page, http://www.nj.gov/oag/ca/chiro/minutes/chmin.htm (last visited May 20, 2008).

In 1996, for example, a licensee asked whether it is permissible to adjust the ankle joint. The Board responded, "the adjustment of extremities is permitted as long as the adjustment *is connected* to spinal adjustment." State Board of Chiropractic Examiners, *Public Session Minutes: July 18, 1996,* § B(6) (emphasis added).

In 2003, a licensee asked "whether the term 'related structures' can be construed to be . . . the TMJ [temporomandibular joint] or cranial bones and suture." The Board answered:

[Although] a chiropractor cannot treat a stand alone diagnosis of TMJ . . . . [, a] chiropractor's function is to analyze and/or diagnose a spinal disorder that may be contributing to a TMJ problem or conversely a TMJ problem may be causing spinal subluxation.

[State Board of Chiropractic Examiners, *Public Session Minutes: Thursday, Sept. 25, 2003,* § V(A)(1), *available at* http://www.nj.gov/oag/ca/chiro/minutes/chiro925.htm ("Sept. 25 Minutes").]

The Board also expounded on the scope of practice for the purposes of insurance coverage:

[A]ny extraspinal manipulation[ ] *must demonstrate in the clinical record its nexus to the spine and contiguous structures.* That is to say that either the extraspinal condition must have some basis on a condition in the spine or alternatively the extraspinal condition may be causing a problem with the spine.

[Sept. 25 Minutes, *supra,* § V(A)(4) (emphasis added).]

In another comment, also in 2003, addressing the proper scope of chiropractic practice, the Board explained that

to the extent that the record reflects that the extraspinal condition *has some nexus to a spinal condition,* such an adjustment would be appropriately within the Scope of Practice.

[Sept. 25 Minutes, *supra,* § V(A)(6) (emphasis added).]

And, in 2004, the Board responded to an inquiry seeking clarification of the term "related structures" as follows:

[W]hen previously considering this issue [the Board] had opined that *the related structure must be documented in the patient record to have a rational nexus to a spinal condition or vice versa.*

[Board of Chiropractic Examiners, *Public Session Minutes: Apr. 15, 2004,* § IX(B), *available at* http://www.nj.gov/oag/ca/chiro/minutes/chiro415.htm (emphasis added).]

That is the backdrop for our inquiry.

## IV

The primary questions we need to address are whether an extra-spinal adjustment may take place consistent with the laws governing chiropractic and, if so, under what circumstances. The resolution of those issues may involve a conflict between *N.J.S.A.* 45:9–14.5 and *N.J.A.C.* 13:44E–1.1(a). The Appellate Division's holding essentially wrote the words "and related structures" out of the regulation. If that reading of the rule is correct, there is not even a colorable conflict between the statute and the rule. If, however, we interpret the rule as authorizing some extra-spinal adjustment, plaintiff's contention that the rule is *ultra vires* will require our disposition. We therefore turn to the rule first.

In interpreting the rule, we apply the classic standards that govern such interpretation. Generally, under those standards, the intent of the drafters is to be found in the plain language of the enactment. *DiProspero v. Penn,* 183 *N.J.* 477,

492, 874 *A*.2d 1039 (2005). If the language is clear, then the interpretative process will end without resort to extrinsic sources. *Ibid.* We look to extrinsic evidence if a plain reading of the enactment leads to more than one plausible interpretation. *Id.* at 492–93, 874 *A*.2d 1039. Among the sources that inform us is the long-standing meaning ascribed to the language by the agency charged with its enforcement. *Malone v. Fender,* 80 *N.J.* 129, 137–38, 402 *A*.2d 240 (1979). In the final analysis, the polestar of the inquiry is the intent of the drafters. *Krupp v. Bd. of Educ. of Union County Reg'l High Sch. Dist. No. 1,* 278 *N.J.Super.* 31, 38, 650 *A*.2d 366 (App.Div.1994), *certif. denied,* 140 *N.J.* 277, 658 *A*.2d 301 (1995).

Accordingly, in interpreting *N.J.A.C.* 13:44E–1.1(a), we begin with its plain language:

> The practice of chiropractic is that patient health care discipline whose methodology is *the adjustment and/or manipulation of the articulations of the spine and related structures.* During the initial consultation and before commencing chiropractic care, a licensee shall identify and document a clinical condition warranting chiropractic care. Nothing herein contained shall be deemed to prohibit a licensee from caring for chiropractic subluxation as determined by chiropractic analytical procedures. Chiropractic analysis which identifies the existence of a subluxation may be the basis for chiropractic care even in the absence of a subjective complaint or other objective findings.
>
> [ (Emphasis added).]

It is clear from that language that the rule contemplates adjustments that are not limited to the spine. Although the term "related structures" is not defined in the rule and cannot be given ready meaning from the language itself, it is clear that the rule intends to include within the scope of chiropractic practice the adjustment of some structures beyond the articulations of the spine itself. Any reading to the contrary would render superfluous the inclusion of the "related structures" language. To that extent, the Appellate Division's interpretation of the rule as limited to spinal adjustments was wide of the mark.

Because we cannot determine from the words of the rule itself the import of the term "related structures" we look to an extrinsic source—the long-standing interpretation of the term by the

Board. In anticipation of the enactment of the rule and in accordance with the provisions of the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 to –24, the Board grappled with the question facing us during the proposal and comment period. Public commentators on the proposed rule asked the Board to allow chiropractic practice to include the adjustment of "all joints and bones of the body." 24 *N.J.R.* 642(a) (Feb. 18, 1992). The Board refused and maintained the "relatedness" requirement, noting that it conformed "with prior practice and has been understood and interpreted in the past to naturally include the biomechanic and neurologic systems which *impact* on the spine." 24 *N.J.R.* 643 (Feb. 18, 1992) (emphasis added). Thus, at the time of publication, the Board underscored that an extra-spinal adjustment is allowable if it is connected to a spinal condition.

That approach to the "related structures" language has continued over the past two decades, during which the Board has recognized that the adjustment of "related structures" is allowed only to the extent that a condition of the structure adjusted impacts on, contributes to, or has a nexus to a spinal condition or vice versa. In addition, the Board requires that nexus to be "demonstrated" in the clinical record. Sept. 25 Minutes, *supra*, § V(A)(4). By that language, the Board has reaffirmed that the primary focus of chiropractic is the spine, recognizing nevertheless that conditions of other bodily structures may be the cause or result of a spinal condition and thus may require adjustment.

Because that interpretation by the agency empowered to administer the laws governing chiropractic is a clear and unequivocal one that does no violence to the words of the rule, we recognize it here. We are satisfied that *N.J.A.C.* 13:44–E–1.1(a) permits manipulation of articulations beyond those of the spine when there exists a causal nexus between a condition of the manipulated structure and a condition of the spine. Whether adjustment of a particular portion of the body is permissible as a "related structure" under *N.J.A.C.* 13:44E–1.1(a) must be determined and demonstrated by the practitioner on a case-by-case

basis, focusing on whether a condition of the adjusted structure bears a causal relationship to a condition of the spine. Under that reading, it may or may not be permissible to adjust a knee. Whether the adjustment of a knee properly falls within the scope of chiropractic practice under *N.J.A.C.* 13:44E–1.1(a) must be determined on the facts of each case.

## V

Having ascertained the meaning of *N.J.A.C.* 13:44E–1.1(a), the question that remains is whether the rule exceeds statutory limitations on the scope of chiropractic practice. Plaintiff argues that *N.J.S.A.* 45:9–14.5, which defines the practice of chiropractic, does not allow for the adjustment of extremities and that *N.J.A.C.* 13:44E–1.1(a) is therefore *ultra vires.* To be sure, *N.J.S.A.* 45:9–14.5 defines chiropractic as "[a] system of adjusting the articulations of the spinal column by manipulation thereof," and if it was the sole reference to the scope of chiropractic in the statute, plaintiff's argument would be persuasive.

That, however, is not the case. The definitional section is only one relevant part of the statute. It is well-established that statutes must be read in their entirety; each part or section should be construed in connection with every other part or section to provide a harmonious whole. *In re Distribution of Liquid Assets,* 168 *N.J.* 1, 17–18, 773 *A.*2d 6 (2001); *State v. Brown,* 22 *N.J.* 405, 415–16, 126 *A.*2d 161 (1956).

Here, when *N.J.S.A.* 45:9–14.5 is read in context, plaintiff's interpretation pales. Another provision of the statute, *N.J.S.A.* 45:9–41.27, specifically addresses what the Legislature denominated the "scope of chiropractic," thus underscoring that the definitional section was not intended as an all-encompassing statement of the parameters of chiropractic practice. Moreover, the scope provision is expansive insofar as it prescribes that "nothing in this Act shall be deemed to prohibit a chiropractor from caring for a chiropractic subluxation as determined by chiropractic analytical procedures," thus introducing the notion of standard chiro-

practic practices into the Act. In addition, *N.J.S.A.* 45:9–41.26 provides that the "[l]aws of this State relating to the practice of chiropractic and not amended by, or inconsistent with, this act shall remain in effect." By amplifying the definitional section with the scope section; by incorporating "chiropractic analytic procedures;" and by weaving into the fabric of the statute all other statutes and regulations not amended by or inconsistent with the Act, the Legislature rendered the definitional section of the Act only a part of the relevant analysis. By that action it affirmed the Board's expressed understanding of its role as the arbiter of the scope of chiropractic practice.

The history of chiropractic regulation underscores that was what the Legislature had in mind. As we have said, the definition of chiropractic as "adjustment of the articulations of the spinal column" was enacted in 1953. The language of the Board's regulation authorizing adjustment of the spine and "related structures" has been in effect since 1984, at which time it was declared to be a codification of "long standing Board interpretation of the pertinent statutes." 16 *N.J.R.* 3209 (Nov. 19, 1984). The statute has been amended four times since 1984. Some of those amendments specifically rejected other Board regulations. *See, e.g., N.J.S.A.* 45:9–41.27 (eliminating patient discomfort requirement). Yet the Legislature never signaled any change in the "related structures" language. Because the Legislature is presumed to act with knowledge of the continuous construction the Board has placed on the statute, *State v. Fleischman,* 189 *N.J.* 539, 550, 917 *A.*2d 722 (2007), its reenactment of the 1953 language without change in 1989, leads irresistibly to the conclusion that it was satisfied with the Board's interpretation.[3]

---

[3] After the Appellate Division decision in this case, a bill to amend *N.J.S.A.* 45:9–14.5 was introduced in the Senate. S. 227, 213th Leg., 2008 Sess. (N.J.2008). The bill provided: "It is within the lawful scope of the practice of chiropractic to diagnose, adjust, and treat the articulations of the spinal column and other joints, articulations, and soft tissue structures...." *Ibid.* The bill was passed by the Senate on March 3, 2008. On the same day the bill was received in the General Assembly. On May 5, 2008, an identical bill was

We take from the Legislature's long-standing acquiescence to the Board's interpretation of the Act the conclusion that it did not intend to prohibit all extra-spinal manipulation. Rather, it appears that the Legislature was satisfied to allow the Board to provide the nuances of the statutory scheme, including permitting extra-spinal adjustments that are related to a spinal condition.

It follows that the Appellate Division erred in concluding that chiropractors are absolutely prohibited from performing extra-spinal adjustments. That is not to suggest that such adjustments have no limits. Indeed, the "related structures" language has been explicitly addressed by the Board and requires a logical nexus between an extra-spinal condition and a condition of the spine. The margins of that nexus are not before us. All that we have been asked to address is the plaintiff's contention that there is an absolute prohibition against extra-spinal manipulation in our law. With respect to that issue, we hold that no such prohibition exists and that whether the adjustment of a structure beyond the spine properly falls within the scope of chiropractic practice is dependent on whether the adjustment bears a nexus to a condition of the spine.

## VI

Accordingly, the case must be remanded for a new trial, at which the parties may present evidence regarding whether a condition of the knee adjusted in this case bore a nexus to a spinal condition, thus qualifying it as a manipulation of a related structure. That will be a matter of expert proof. We note that at least one witness at trial testified essentially that a chiropractor can manipulate any extremity because there is "a kinetic linkage" between all extremities and the spine. We do not view such testimony as sufficient to establish the "relatedness" required

introduced in the General Assembly and referred to the Assembly Regulated Professions Committee. General Assemb. 2574, 213th Leg., 2008 Sess. (N.J. 2008).

under the regulation. At trial, the experts must focus on the specific facts of the case and state what it was about the extra-spinal condition that was or was not related either by cause or effect to a spinal condition. Moreover, evidence of documentation of that relationship in the patient's record will be relevant.

The jury should be instructed that, if it concludes that no condition of the adjusted structure was properly related to a spinal condition, the adjustment would fall outside the scope of chiropractic practice in New Jersey, as defined in the statutes and regulations, and that such violation may be considered evidence that defendants were negligent. *Frugis v. Bracigliano,* 177 *N.J.* 250, 271, 827 *A.*2d 1040 (2003).

## VII

The judgment of the Appellate Division is affirmed as modified for the reasons set forth above. The matter is remanded for a new trial consistent with this opinion.

Justice ALBIN, concurring in part, dissenting in part.

This Court has been charged with interpreting the simple words of *N.J.S.A.* 45:9–14.5: "the practice of chiropractic is defined as ... '[a] system of adjusting the articulations of the spinal column by manipulation thereof.' " Those words clearly restrict the scope of chiropractic care in New Jersey to manipulations of spinal joints. Nevertheless, the board governing the practice of chiropractic promulgated a regulation broadening the scope of chiropractic to "the adjustment and/or manipulation of the articulations of the spine *and related structures.*" *N.J.A.C.* 13:44E–1.1(a) (emphasis added).[1] In effect, the board arrogated to chiropractors a power not authorized by the statute. Through the guise of a regulation, the board may not rewrite a statute. *Cooper Univ.*

---

[1] As the majority notes, originally the State Board of Medical Examiners governed chiropractic in New Jersey, but the State Board of Chiropractic Examiners has since taken over that role. *Ante* at 217, 218, 948 *A.*2d 1272.

*Hosp. v. Jacobs,* 191 *N.J.* 125, 141, 922 *A.*2d 731 (2007) (explaining that when agency interprets statute, it " 'may not . . . give the statute any greater effect than its language allows' " (quoting *Saint Peter's Univ. Hosp. v. Lacy,* 185 *N.J.* 1, 13, 878 *A.*2d 829 (2005))). In doing so here, the board has manipulated the words of the statute to allow chiropractors to manipulate every joint throughout the body. Because the majority upholds the board's errant interpretation, I cannot join in Part V of its opinion.

Nowhere in the statute is there any suggestion that chiropractors are permitted to manipulate "related structures" of the spine. Although we give considerable weight to an administrative agency's interpretation of a statute it is charged with enforcing, ultimately we are not bound by an agency's misinterpretation of the law. *Utley v. Bd. of Review,* 194 *N.J.* 534, 551, 946 *A.*2d 1039, 1048–49 (2008); *see also Shim v. Rutgers,* 191 *N.J.* 374, 390, 924 *A.*2d 465 (2007) ("[I]f a regulation is 'plainly at odds with the statute, [the Court] must set it aside.' " (second alteration in original) (quoting *In re Freshwater Wetlands Prot. Act Rules,* 180 *N.J.* 478, 489, 852 *A.*2d 1083 (2004))).

I disagree with the majority's view that the definition of chiropractic in *N.J.S.A.* 45:9–14.5, which was adopted in its current form in 1953, *see L.* 1953, *c.* 233, § 3, was superseded by the later enactment of the Chiropractic Board Act in 1989, *L.* 1989, *c.* 153 (codified at *N.J.S.A.* 45:9–41.17 to –41.27). *See ante* at 224–25, 948 *A.*2d 1281–82. While the 1989 Act makes several references to what chiropractors may do, it did not purport to alter the 1953 definition of chiropractic. That is clear because the 1989 Act specifically provides that "[t]he scope of practice of chiropractic shall remain as defined in existing statutes." *N.J.S.A.* 45:9–41.27. Thus, the definition contained in the pre-existing statute— *N.J.S.A.* 45:9–14.5—was not altered by the 1989 Act's passage and remains legally binding.

I realize that chiropractors throughout the state have come to rely on the Board's interpretation of the scope of chiropractic, and that it would be unfair to expose them to liability on the basis of

that reliance. For that reason, I would invalidate *N.J.A.C.* 13:44E–1.1(a) prospectively. *See Reuter v. Borough Council of Fort Lee,* 167 *N.J.* 38, 41–43, 768 *A.*2d 769 (2001) (holding that ordinance ran afoul of statute, but applying decision prospectively because of "long-term interpretation of the law" and "reliance" on that interpretation). Moreover, I would stay the effect of the invalidation for ninety days to allow the Legislature, if it wished, to enact supplemental legislation expanding the scope of chiropractic to conform with current practices. Cf. *Lewis v. Harris,* 188 *N.J.* 415, 463, 908 *A.*2d 196 (2006) (giving Legislature 180 days to "either amend the marriage statutes or enact an appropriate statutory structure" providing "committed same-sex couples ... the full rights and benefits enjoyed by heterosexual married couples"); *N.J. Coal. Against War in the Middle E. v. J.M.B. Realty Corp.,* 138 *N.J.* 326, 332, 379, 650 *A.*2d 757 (1994) (concluding that defendant shopping centers violated plaintiffs' free speech rights, but staying judgment for sixty days to allow defendants "time to prepare regulations and procedures concerning applications to leaflet and the activity itself"), *cert. denied,* 516 *U.S.* 812, 116 *S.Ct.* 62, 133 *L.Ed.*2d 25 (1995). If the Legislature erred in limiting the scope of chiropractic in 1953, the Legislature—not this Court—should say so.

I agree with the result the majority reaches regarding the application of the regulation to the parties before us. I therefore respectfully concur in Parts I through IV and Parts VI and VII of the majority's opinion, and in the judgment of the Court.

Justice RIVERA–SOTO joins in this opinion.

*For affirmance as modified*—Justices LONG, LaVECCHIA, WALLACE and HOENS—4.

*Concurrence in Part/Dissent in Part*—Justices ALBIN and RIVERA–SOTO—2.