**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1733-19

COZZOLI MACHINE
COMPANY,

      Plaintiff-Respondent,

v.

CROWN REAL ESTATE
HOLDINGS, INC.,

      Defendant,

and

SUMO PROPERTY
MANAGEMENT, LLC,

      Defendant-Appellant.

_____

Argued September 28, 2021 – Decided December 7, 2021

Before Judges Messano and Accurso.

On appeal from the Superior Court of New Jersey, Chancery Division, Union County, Docket No. C-000142-17.

Victoria A. Flynn argued the cause for appellant (Hill Wallack, LLP, attorneys; Eric I. Abraham, of counsel; Victoria A. Flynn, on the briefs).

Matthew S. Slowinski argued the cause for respondent (Slowinski Atkins, LLP, attorneys; Matthew S. Slowinski, on the brief).

PER CURIAM

Plaintiff Cozzoli Machine Company operated an industrial establishment in Plainfield for most of the twentieth century. In March 2003, pursuant to the Industrial Site Remediation Act, N.J.S.A. 13:1K-6 to -13.1, plaintiff and the owner of the real property, MJ Realty Co. (MJR), a partnership that included plaintiff, entered into an agreement with the New Jersey Department of Environmental Protection (DEP) to remediate the site (the Agreement). The Agreement anticipated plaintiff terminating all operations at the site by March 28, 2003, and selling the property to Noray and Talir Bakalayan, the only members of RTN, LLC.

RTN funded the purchase through Crown Bank and took title to the property in May 2003. RTN eventually defaulted. Crown Bank began foreclosure proceedings in 2010 and took title to the property in 2012; title ultimately vested with defendant Crown Real Estate Holdings, Inc. (Crown), a subsidiary of the bank.

A-1733-19

On October 17, 2017, pursuant to N.J.S.A. 58:10B-16[1] and Rule 4:67-1, plaintiff filed a summary action by way of verified complaint and order to show cause against Crown seeking access to the property to complete its remediation and injunctive relief requiring Crown to execute a deed notice. See N.J.A.C. 7:26E-5.2(a)(5) (requiring the filing of a deed notice in certain circumstances by "[t]he person responsible for conducting the remediation"); N.J.A.C. 7:26C-7.2 (setting forth administrative requirements of a deed notice). Crown filed an answer and counterclaim alleging plaintiff tortiously interfered with its pursuit of economic advantages. To the extent necessary, we discuss the procedural aspects of the litigation that followed.

---

[1] In relevant part, the statute, a provision of the Brownfield and Contaminated Site Remediation Act (the Act), N.J.S.A. 58:10B-1 to -31, permits entry onto real property by someone who is not the owner "to undertake[] the remediation of suspected or actual contamination." N.J.S.A. 58:10B-16(a)(1). It provides in part:

> If, after good faith efforts, the person undertaking the remediation and the property owner fail to reach an agreement concerning access to the property, the person undertaking the remediation shall seek an order from the Superior Court directing the property owner to grant reasonable access to the property and the court may proceed in the action in a summary manner.
>
> [Ibid.]

When Crown conveyed the property to Sumo Property Management, LLC (Sumo), plaintiff amended its complaint to name Sumo, and the court dismissed the complaint against Crown. Sumo moved, as had Crown, to dismiss the complaint for failure to state a claim. R. 4:6-2(e). The judge's September 14, 2018 order denied that motion supported by a written statement of reasons (SOR).

Sumo moved for reconsideration shortly before the trial date. The motion was supported by the report of a proposed expert, Scott R. Drew, a Licensed Site Remediation Professional (LSRP), that Sumo produced for the first time. Citing historic correspondence between DEP and plaintiff that questioned the nature of contamination on the property, Drew opined that the contamination was not "historic fill," remediation of which could be accomplished with "capping" and a deed notice. Rather, in his opinion, more extensive remediation efforts were necessary.

Jacinto Rodrigues, the chairman and Chief Executive Officer of Crown and also the managing member of Sumo,[2] filed a certification in support of the reconsideration motion, stating that Sumo would consent to plaintiff's entry on the property, but only if it agreed to remediate in a manner consistent with DEP's

---

[2] Rodrigues and his wife are the only members of Sumo.

more stringent standards for residential development. The judge's April 12, 2019 order denied the reconsideration motion.

The trial was adjourned, and plaintiff moved for summary judgment and, alternatively, to bar Drew from testifying. Plaintiff contended that Drew's opinion was a net opinion unsupported by any actual testing or sampling of the property. It also argued that pursuant to the doctrine of judicial estoppel, Sumo should be barred from proffering Drew's testimony that the property contained anything but historic fill. Plaintiff noted in prior filings that Crown argued entry on the property was unnecessary because the site contained only historic fill. The judge entered an order on September 17, 2019, denying plaintiff's request for summary judgment, but barring Drew "from testifying that there is historic fill on the property."[3]

At trial, plaintiff presented the testimony of Kenneth L. Nieuwenhuis, an LSRP and owner of Peak Environmental LLC (Peak), and several documents were admitted into evidence; we discuss them as necessary below. On November 14, 2019, the judge entered an order supported by a written SOR granting plaintiff access to the property to complete its remedial activities and

---

[3] This language seems to be a typographical error. The judge's written SOR that accompanied the order concluded Sumo was judicially estopped from now taking the position that there was only historic fill on the site.

A-1733-19

requiring Sumo to "execute the [d]eed [n]otice and pay all reasonable costs associated with it." Sumo subsequently moved for a stay pending appeal, which the judge granted.

Before us, Sumo argues the judge disregarded the plain intent of the Act by failing to compel plaintiff to complete its remediation obligations under the statute, and by forcing Sumo to execute the deed notice and accept a "remediation strategy" to which it never consented. Sumo also contends the judge failed to "protect its interests" in developing the property because she applied the doctrine of judicial estoppel and barred a fair presentation of the evidence through Drew's testimony.[4] We affirm.

I.

The record contains additional facts important to our resolution of this appeal.

_____

[4] In a separate point, Sumo makes a similar argument, contending the judge erred in barring Drew's report as a net opinion. Sumo's citations to the judge's written SOR supporting the April 2019 order denying reconsideration, and the SOR supporting the September 2019 order barring Drew's testimony regarding the presence or absence of historic fill, however, fail to support the argument. The former SOR never addressed the net opinion issue, and in the latter, the judge wrote that although Drew did not perform his own tests at the property, "[h]is opinion [wa]s valid since it relie[d] on scientific data relied upon by experts." We do not address the argument any further.

Plaintiff hired Peak to investigate contamination on the property, submit the necessary filings to DEP, and oversee remediation of the site. By the time the complaint was filed, plaintiff allegedly had incurred more than five-hundred thousand dollars in remediation expenses.

In August 2006, prior to Crown Bank's foreclosure, Plainfield adopted a redevelopment plan of which the property was a large part. The redevelopment plan's express purpose was to "promote opportunity for homeownership . . . through the encouragement of high density, multi-family housing as well as compatible commercial uses that serve the daily needs of residents." In 2008, RTN filed suit against plaintiff and MJR (the RTN litigation), asserting that plaintiff and MJR were not remediating the site "in a timely and commercially reasonable manner."

In January 2009, while the lawsuit was pending and remediation efforts ongoing, plaintiff responded to DEP's notice of deficiency (NOD) which cited the lack of "documentation that the current property owner has agreed to the filing of a Deed Notice."[5] Plaintiff's counsel's letter to DEP attached an "Acceptance and Acknowledgement" executed by RTN's principal, Noray

---

[5] The record reveals that the site was designated a Brownfield Development Area sometime in 2009. See N.J.S.A. 58:10B-1.

Bakalayan, agreeing that "engineering and institutional controls, including a Deed Notice may be utilized . . . as part of the remedial strategy." RTN further "agree[d] to execute and record a Deed Notice for the [s]ite . . . once approved by [DEP]."

On March 17, 2009, DEP issued another NOD requiring additional final corrective actions for two areas of concern at the property. In other respects, the NOD called for no further investigation of the site and indicated DEP would issue a "No Further Action/Covenant Not to Sue" at the completion of the case and the filing of "institutional controls," i.e., the Deed Notice. DEP specifically recognized that plaintiff's counsel's January letter "contained documentation that the current property owner agree[d] to the filing of a [d]eed [n]otice." Peak was to submit an appropriate remedial action plan to remove contaminants at the two areas of concern and file a revised action plan to include a draft "site-wide Deed Notice." DEP served the March 17, 2009 NOD on the Plainfield Municipal Clerk and Health Officer.

In his trial testimony, Nieuwenhuis said that Peak had already addressed the two areas of concern. However, the Deed Notice, although drafted, was still required to complete the process and obtain from DEP "a final remediation document," known as "a Response Action Outcome."

Meanwhile, in September 2009, the parties in the RTN litigation entered a stipulation voluntarily dismissing the suit without prejudice and setting forth the conditions of the settlement in a separate agreement incorporated by reference. Among other things, the stipulation required plaintiff and MJR "to continue to use timely and reasonable commercial efforts to conclude the environmental investigation and remediation of the [p]roperty by, inter alia, obtaining a Deed Notice." RTN had secured a potential purchaser of the property, and the stipulation required it to continue those negotiations in good faith. If RTN sold the property for $1.5 million or more, the dismissal of the suit would "become binding as final with prejudice." As noted, RTN never sold the property, but, instead, defaulted on its mortgage with Crown Bank.

In 2015, Crown obtained the approval of the Plainfield Planning Board to construct a 125-unit residential project with underground parking for 118 cars. The approval was conditioned on remediation of the site to the stricter standards for residential developments that DEP requires. Those standards do not permit the "capping" of contaminated sites as proposed by plaintiff, agreed to by RTN, and approved by DEP.

Rodrigues's certification in opposition to the initial order to show cause stated that plaintiff and Crown had engaged in ongoing negotiations to modify

9

the remediation plan for the site so Crown could construct the proposed residential development, but that Crown was unwilling to bear any additional costs to excavate and remove ground cover necessary to bring the property into compliance with DEP's regulations.

## II.

Sumo's central argument is that any consent RTN gave to plaintiff's remediation plan and RTN's agreement to execute a deed notice is ineffective because the Act and its regulations require consent of the "current property owner," and a past owner, like RTN, cannot "bind future owners of the [p]roperty." Sumo relies upon the language of the N.J.S.A. 58:10B-13 (Section 13) and the legislative purposes undergirding the Act for support.

"To the extent that our review involves questions of statutory interpretation . . . our review is de novo." Brugaletta v. Garcia, 234 N.J. 225, 240–41 (2018) (citing Verry v. Franklin Fire Dist. No. 1, 230 N.J. 285, 294 (2017)). Our "objective . . . 'is to effectuate legislative intent,' and '[t]he best source for direction on legislative intent is the very language used by the Legislature.'" Bozzi v. City of Jersey City, 248 N.J. 274, 283 (2021) (alteration in original) (quoting Gilleran v. Twp. of Bloomfield, 227 N.J. 159, 171–72

(2016)).  "If the language is clear, the court's job is complete."  Ibid. (quoting In re Expungement Application of D.J.B., 216 N.J. 433, 440 (2014)).

"Where the plain meaning does not point the court to a 'clear and unambiguous result,' [the court] then considers extrinsic evidence from which it hopes to glean the Legislature's intent."  TAC Assocs. v. N.J. Dep't of Env't Prot., 202 N.J. 533, 541 (2010) (quoting Bedford v. Riello, 195 N.J. 210, 222 (2008)).  "Included within the extrinsic evidence rubric are legislative history and statutory context, which may shed light on the drafters' motives."  Ibid. (citing Aponte-Correa v. Allstate Ins. Co., 162 N.J. 318, 323 (2000)); see also Spade v. Select Comfort Corp., 232 N.J. 504, 515 (2018) ("We construe the words of a statute 'in context with related provisions so as to give sense to the legislation as a whole.'" (quoting N. Jersey Media Grp., Inc. v. Twp. of Lyndhurst, 229 N.J. 541, 570 (2017))).

Before turning to Section 13, we discuss the statutory and regulatory context.  Noting "New Jersey's industrial history," and that "areas formerly used for commercial and industrial purposes [we]re underused or abandoned," the Act required the adoption of "strict remediation standards . . . to protect public health and safety and the environment . . . based upon the risk posed by discharged hazardous substances."  N.J.S.A. 58:10B-1.2.  The Legislature also recognized

11

attendant economic realities, noting that "to encourage the cleanup of contaminated sites, there must be finality in the process, the provision of financial incentives, liability protection for innocent parties who clean up, cleanup procedures that are cost effective and regulatory action that is timely and efficient." Ibid.

The Act required DEP to "develop residential and nonresidential soil remediation standards." N.J.S.A. 58:10B-12(c)(1). "Residential soil remediation standards . . . will allow the unrestricted use of th[e] property," whereas "[n]on-residential soil remediation standards . . . recognize the lower likelihood of exposure to contamination on property that will not be used for residential . . . uses." Ibid.

The Act recognizes that in certain circumstances, remediation is appropriate through the use of engineering controls and institutional controls. "'Engineering controls' means any mechanism to contain or stabilize contamination or ensure the effectiveness of a remedial action[] . . . [and] may include . . . caps, . . . signs, fences and physical access controls." N.J.S.A. 58:10B-1; see also N.J.A.C. 7:26E-1.8.

> "Institutional controls" means a mechanism used to limit human activities at or near a contaminated site, or to ensure the effectiveness of the remedial action over time, when contaminants remain at a contaminated site

in levels or concentrations above the applicable remediation standard that would allow unrestricted use of that property. Institutional controls may include, without limitation . . . deed notices.

[Ibid.; see also N.J.A.C. 7:26E-1.8.]

Among other things, the Act required DEP to "establish a procedure for a person to demonstrate that a particular parcel of land contains large quantities of historical fill material," defined as "generally large volumes of non-indigenous material, no matter what date they were emplaced on the site, used to raise the topographic elevation of a site, which were contaminated prior to emplacement and are in no way connected with the operations at the location of emplacement." N.J.S.A. 58:10B-12(h)(1); see also N.J.A.C. 7:26E-1.8. Critically,

Upon a determination by [DEP] that large quantities of historic fill material exist on that parcel of land, there is a rebuttable presumption that [DEP] shall not require any person to remove or treat the fill material in order to comply with applicable health risk or environmental standards. In these areas[, DEP] shall establish by regulation the requirement for engineering or institutional controls that are designed to prevent exposure of these contaminants to humans, that allow for the continued use of the property, that are less costly than removal or treatment, which maintain the health risk standards . . . , and, as applicable, are protective of the environment.

[N.J.S.A. 58:10B-12(h)(1).]

The regulation implementing this provision of the Act, N.J.A.C. 7:26E-5.4(a), states: "Notwithstanding the presumptive remedies for residences . . . there is a rebuttable presumption pursuant to N.J.S.A. 58:10B-12h that the remedial action for soil contamination associated with historic fill material is the establishment of engineering and institutional controls pursuant to N.J.A.C. 7:26C-7." (Emphasis added).

N.J.A.C. 7:26C-7.2(a) in turn sets forth the administrative requirements for a deed notice, including that it be "worded exactly" as a model document in an appendix to the regulations. N.J.A.C. 7:26C-7.2(a)(1). Notably, the model deed notice requires that the actual filed deed notice include as an exhibit, "[a]s-built diagrams of each engineering control, including caps . . . that may be required as part of a ground water engineering control in addition to the deed notice." N.J.A.C. 7:26, Appx. B, § 12B(i)(A).

We come then to the provisions of Section 13, the nub of Sumo's argument. Subsection (a)(2) requires that "[w]hen . . . engineering or institutional controls are used in lieu of remediating a site . . . the person responsible for conducting the remediation shall . . . with the consent of the owner of the real property, provide for the recording with the office of the county recording officer, in the county in which the property is located," an appropriate

14

deed notice. N.J.S.A. 58:10B-13(a)(2); see also N.J.A.C. 7:26C-7.2(c)(1) (requiring the remediator to provide DEP "with the property owner's written agreement to record the deed notice"). "The notice shall be recorded in the same manner as are deeds and other interests in real property." N.J.S.A. 58:10B-13(a)(2).

Subsection (b), however, provides: "If the owner of the real property does not consent to the recording of a notice pursuant to paragraph (2) of subsection a. . . . , the person responsible for conducting the remediation shall implement a remedial action that meets the residential soil remediation standard in the remediation of that real property." Sumo's argument is straightforward: because it did not consent to the deed notice, plaintiff must remediate the property to residential standards.

The record is clear: plaintiff obtained the consent of RTN, the then-current property owner, to the filing of a deed notice in 2009. DEP recognized this in its March 2009 NOD. Obviously, Sumo's position only advances its transparent financial interests, which did not come into being until Sumo acquired the property — after DEP had already executed the Agreement with plaintiff, and plaintiff initiated remediation efforts, obtained RTN's consent to execute the deed notice, and addressed DEP's March 2009 NOD.

A-1733-19

Plaintiff had no control over disposition of the property thereafter. Sumo's position would hold a good-faith remediator, who had essentially obtained DEP's approval of its plan and the consent of the current owner to the filing of a deed notice, hostage to the demands and whims of the property's successors-in-interest. That would be inconsistent with the Legislature's stated purpose to enact "cleanup procedures that are cost effective and regulatory action that is timely and efficient." N.J.S.A. 58:10B-1.2.

Moreover, DEP's regulations provided plaintiff with a "rebuttable presumption" that any remedial action at the property could be accomplished through "the establishment of engineering and institutional controls" because the contamination was historic fill. N.J.A.C. 7:26E-5.4(a). Obtaining the consent of the owner was a condition precedent for plaintiff to "use . . . that standard or control measure." N.J.S.A. 58:10B-13(a)(2). That is precisely what DEP required and what plaintiff did. Nothing in the record reveals that Sumo or its predecessors-in-interest ever challenged DEP's determination regarding the nature of the contamination until plaintiff brought this suit and Sumo belatedly sought to introduce Drew's expert opinion.

A-1733-19

We also reject Sumo's claims that it was unaware of RTN's consent because neither it nor the Agreement was ever publicly filed.[6] Sumo argues it was improper for the judge to impute RTN's consent to Sumo, a separate legal entity from Crown, in turn a subsidiary of RTN's mortgagee, Crown Bank. We agree that Sumo and Crown's interlocking ownership presents sufficient evidence to impute such knowledge. Rodrigues was both the chairman and CEO of Crown while Crown was a party to this lawsuit. Crown then transferred the property to Sumo, where Rodrigues was the managing member.

There is another reason why Sumo should be bound by RTN's consent. "[A] party may be charged with inquiry notice where there are facts or circumstances indicating some outside claim that would prompt a reasonable purchaser to investigate further." Pearson v. DMH 2 LLC, 449 N.J. Super. 30, 50 (Ch. Div. 2016). Therefore, a "claimant will be charged with knowledge of whatever such an inquiry would uncover where facts are brought to his [or her] attention, 'sufficient to apprise . . . of the existence of an outstanding title or claim, or the surrounding circumstances are suspicious and the party

---

[6] To the extent Sumo suggests it was not on notice because of plaintiff's failure to record the deed notice, the argument lacks sufficient merit to warrant extensive discussion. R. 2:11-3(e)(1)(E). As the regulations already cited provide for the deed notice to include as an exhibit "as built" drawings of all engineering controls at the site, it could not be filed until they were installed.

purposefully or knowingly avoids further inquiry.'" Friendship Manor, Inc. v. Greiman, 244 N.J. Super. 104, 108 (App. Div. 1990) (quoting Scult v. Bergen Valley Builders, Inc., 76 N.J. Super. 124, 135 (Ch. Div. 1962)).

As mortgagee-in-possession at the time of foreclosure, Crown Bank was charged with inquiry notice of RTN's consent because DEP's March 2009 NOD was on file with the municipal clerk and health officer. Plaintiff alludes to other indicia of the condition of the property, such as its Brownfields Designation and signs and notices that were posted. Additionally, RTN and plaintiff were in active litigation. Surely, even a perfunctory investigation of its mortgagor's property would have made Crown Bank aware of DEP's involvement and plaintiff's remediation plan before it foreclosed. From that point in time, Crown and Sumo were at least charged with inquiry notice such that Sumo cannot rely on a lack of public documentation to support its contention.

### III.

Sumo contends the judge erred in utilizing the doctrine of judicial estoppel to bar Drew's testimony, thereby denying it a fair opportunity to defend against plaintiff's complaint. Sumo claims the judge never accorded it an opportunity to argue against application of the doctrine, and, because positions taken by

18

Crown during the course of the litigation cannot be attributable to Sumo, a separate legal entity, the doctrine is inapplicable as a matter of law.

Judicial estoppel is "an equitable doctrine precluding a party from asserting a position in a case that contradicts or is inconsistent with a position previously asserted by the party in the case or a related legal proceeding." Newell v. Hudson, 376 N.J. Super. 29, 38 (App. Div. 2005) (quoting Tamburelli Props. Ass'n v. Borough of Cresskill, 308 N.J. Super. 326, 335 (App. Div. 1998)). "To protect the integrity of the court system, '[w]hen a party successfully asserts a position in a prior legal proceeding, that party cannot assert a contrary position in subsequent litigation arising out of the same events.'" In re Declaratory Judgment Actions Filed by Various Muns., 446 N.J. Super. 259, 291–92 (App. Div. 2016) (alteration in original) (quoting Kress v. La Villa, 335 N.J. Super. 400, 412 (App. Div. 2000)). "Prior success does not mean that a party prevailed in the underlying action, it only means that the party was allowed by the court to maintain the position." Cummings v. Bahr, 295 N.J. Super. 374, 387 (App. Div. 1996).

Here, it is indisputable that Crown sought reconsideration of the denial of its motion to dismiss the complaint arguing, in part, there was only historic fill on the property, historic fill was not a "contaminant" under the Act, and

engineering controls and a deed notice were unnecessary. Clearly, if Crown remained the party defendant in this case through the court's final order, after losing those applications it would have been judicially estopped from asserting the property contained contaminants other than historic fill and engineering controls and a deed notice were inadequate.

For reasons already expressed, the judge was justified in concluding the mid-litigation conveyance of the property from Crown, where Rodrigues was president and CEO, to Sumo, where he was the sole managing member, was simply an attempt to "play fast and loose" with the court. Any claim that Sumo was not given a chance to rebut plaintiff's argument that judicial estoppel should not apply lacks sufficient merit to warrant discussion in a written opinion.

The judge, however, also reasoned that Drew's report only surfaced through an improperly filed motion for reconsideration made immediately before trial. Certainly, Crown and Sumo had the opportunity to produce the report sooner; Sumo has never contended otherwise. Whether viewed solely as a discovery issue or in the broader context of the judge's management of the trial, we conclude there was no error in her barring Drew as an expert witness for Sumo. See, e.g., C.A. by Applegrad v. Bentolila, 219 N.J. 449, 459 (2014) ("An appellate court applies 'an abuse of discretion standard to decisions made

by [the] trial courts relating to matters of discovery.'" (alteration in original) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011))); Zehl v. City of Elizabeth Bd. of Educ., 426 N.J. Super. 129, 141 (App. Div. 2012) ("Judges retain the inherent authority to impose reasonable conditions on motion practice to allow for appropriate case management and the efficient and effective administration of the case.").

For all these reasons, we affirm the November 14, 2019 final order permitting plaintiff entry onto the property to complete any engineering controls and ordering Sumo to execute an appropriate deed notice and bear all reasonable costs associated with it. We also vacate the December 30, 2019 order that entered a stay pending appeal.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21