**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1272-19
A-1275-19
A-1281-19
A-1283-19
A-1284-19
A-1285-19
A-1286-19
A-1416-19
A-1656-19
A-1743-19
A-1744-19
A-1747-19
A-1754-19
A-1766-19
A-2166-19

IN THE MATTER OF THE APPLICATION OF
MEDICINAL MARIJUANA ALTERNATIVE
TREATMENT CENTER FOR TETRA GROW,
LLC (SOUTH)

_____

IN THE MATTER OF THE APPLICATION OF
MEDICINAL MARIJUANA ALTERNATIVE
TREATMENT CENTER FOR LIBERTY PLANT
SCIENCES (NORTH)

_____

IN THE MATTER OF THE APPLICATION FOR
MEDICINAL MARIJUANA ALTERNATIVE
TREATMENT CENTER FOR PROGRESSIVE

TREATMENT SOLUTIONS OF
NEW JERSEY, INC. (CENTRAL)

_____

IN THE MATTER OF THE APPLICATION OF
MEDICINAL MARIJUANA ALTERNATIVE
TREATMENT CENTER FOR GARDEN STATE
OPERATIONS, LLC (CENTRAL)

_____

IN THE MATTER OF THE APPLICATION OF
MEDICINAL MARIJUANA ALTERNATIVE
TREATMENT CENTER FOR GARDEN STATE
OPERATIONS, LLC (NORTH)

_____

IN THE MATTER OF THE APPLICATION OF
MEDICINAL MARIJUANA ALTERNATIVE
TREATMENT CENTER FOR CANNWELL, LLC

_____

IN THE MATTER OF THE APPLICATION OF
MEDICINAL MARIJUANA ALTERNATIVE
TREATMENT CENTER FOR CORE
EMPOWERMENT NJ LLC

_____

IN THE MATTER OF THE APPLICATION OF
MEDICINAL MARIJUANA ALTERNATIVE
TREATMENT CENTER FOR AUGUST TENTH
CAPITAL INVESTMENTS, LLC (NORTH)

_____

IN THE MATTER OF THE APPLICATION OF
MEDICINAL MARIJUANA ALTERNATIVE
TREATMENT CENTER FOR COMMUNITY
WELLNESS OF NEW JERSEY LLC (CENTRAL)

_____

A-1272-19

IN THE MATTER OF THE APPLICATION OF MEDICINAL MARIJUANA ALTERNATIVE TREATMENT CENTER FOR IMPEL DIGITAL LLC (NORTH)

_____

IN THE MATTER OF THE APPLICATION OF MEDICINAL MARIJUANA ALTERNATIVE TREATMENT CENTER FOR IMPEL DIGITAL LLC (SOUTH)

_____

IN THE MATTER OF THE APPLICATION FOR MEDICINAL MARIJUANA ALTERNATIVE TREATMENT CENTER FOR ZY LABS, LLC

_____

IN THE MATTER OF THE APPLICATION FOR MEDICINAL MARIJUANA ALTERNATIVE TREATMENT CENTER FOR PG HEALTH LLC (SOUTH)

_____

IN THE MATTER OF APPLICATION FOR MEDICINAL MARIJUANA ALTERNATIVE TREATMENT CENTER FOR LEGENDARY WELLNESS NJ, LLC

_____

IN THE MATTER OF APPLICATION FOR MEDICINAL MARIJUANA ALTERNATIVE TREATMENT CENTER FOR MARINUS HOLDINGS, LLC (SOUTH)

_____

Argued[1] and Submitted[2] February 2, 2021 –
Decided February 18, 2021

Before Judges Fisher, Moynihan and Gummer.

On appeal from final agency decisions of the New
Jersey Department of Health.

Joshua S. Bauchner argued the cause for appellants
Tetra Grow LLC, Liberty Plant Sciences, LLC, Garden
State Operations LLC, Cannwell LLC, Core
Empowerment LLC (Ansell Grimm & Aaron, P.C.,
attorneys; Joshua S. Bauchner, of counsel and on the
briefs; Rahool Patel, on the briefs).

Cameryn J. Hinton argued the cause for appellant
Progressive Treatment Solutions of New Jersey, Inc.
(Greenbaum, Rowe, Smith & Davis LLP, attorneys;
Luke J. Kealy, Cameryn J. Hinton, Jack J. Fersko and
Steve Firkser, on the briefs).

Craig S. Provorny argued the cause for appellant
Community Wellness of New Jersey LLC (Herold Law,
P.A., attorneys; Craig S. Provorny, on the briefs).

Lee Vartan argued the cause for appellant ZY Labs,
LLC (Chiesa Shahinian & Giantomasi PC, attorneys;
Lee Vartan, Brian P. O'Neill and James R. Hearon, on
the briefs).

Ansell Grimm & Aaron, P.C., attorneys for appellants,
Impel Digital LLC, and Marinus Holdings, LLC,

[1] A-1272-19, A-1275-19, A-1281-19, A-1283-19, A-1284-19, A-1285-19, A-1286-19, A-1656-19 and A-1747-19 were argued.

[2] A-1416-19, A-1743-19, A-1744-19, A-1754-19, A-1766-19, and A-2166-19 were submitted.

(Joshua S. Bauchner, of counsel and on the briefs; Rahool Patel, on the briefs).

Edward N. Tobias, attorney for August Tenth Capital Investments LLC.

Lauletta Birnbaum, and Krishna B. Narine, of the Pennsylvania bar, admitted pro hac vice, attorneys for appellant PG Health LLC (Steven Doto and Krishna B. Narine, on the briefs).

Matthew T. Priore, attorney for appellant Legendary Wellness, LLC.

Jacqueline R. D'Alessandro, Deputy Attorney General, argued the cause for respondent New Jersey Department of Health (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Jacqueline R. D'Alessandro, Deputy Attorney General, on the briefs).

PER CURIAM

These appeals – some consolidated and the remainder scheduled back-to-back – require our consideration of final agency decisions that disqualified appellants' applications for permits to operate medicinal marijuana Alternate Treatment Centers (ATCs). Unlike the issues considered in a decision rendered earlier this term[3] – when we considered challenges to the Department of Health's scoring of ATC applications – the arguments presented here question final

---

[3] In re Application for Medicinal Marijuana ATC for Pangaea Health & Wellness, LLC, __ N.J. Super. __ (App. Div. 2020).

agency decisions that found appellants' applications were not eligible to be scored for several reasons. Excluding ZY Labs, LLC's appeal, we affirm the final agency decisions under review. As for ZY Labs, we reverse and remand to the Department of Health for further proceedings.

I

By way of background, we note that the Compassionate Use of Medical Marijuana Act[4] provides qualifying patients, their caregivers, and those authorized to produce, process, and dispense marijuana pursuant to its terms, with protection from arrest, prosecution, and other penalties when possessing marijuana for medical purposes. N.J.S.A. 24:6I-2(e); N.J.S.A. 24:6I-7. The Compassionate Use Act charges the Department of Health with implementing New Jersey's Medicinal Marijuana Program (the Program). N.J.S.A. 24:6I-3; Pangaea Health & Wellness, __ N.J. Super. at __ (slip op. at 6); Natural Med., Inc. v. N.J. Dep't of Health & Senior Servs., 428 N.J. Super. 259, 262 (App. Div. 2012). This includes establishing a registry of qualified patients and issuing permits for the operation of ATCs. N.J.S.A. 24:6I-4; N.J.S.A. 24:6I-7.1; Pangaea Health & Wellness, __ N.J. Super. at __ (slip op. at 6); Natural Med., 428 N.J. Super at 262.

_____

[4] N.J.S.A. 24:6I-1 to -30.

N.J.S.A. 24:6I-7(a)(3) requires that the Department "seek to ensure" the availability of a sufficient number of ATCs throughout the State, pursuant to need, and that the Department must issue permits for "at least two [ATCs] each in the northern, central, and southern regions of the State." Beyond the mandated minimum of six ATCs, the Department was imbued with "discretion to determine how many ATCs are needed to meet the demand for medicinal marijuana and whether the issuance of a permit to a particular applicant would be consistent with [legislative] purposes." Pangaea Health & Wellness, __ N.J. Super. at __ (slip op. at 7); Natural Med., 428 N.J. Super at 263. The Department has promulgated regulations, N.J.A.C. 8:64-1.1 to -13.11, that provide the framework through which it issues requests for applications (RFAs) for the operation of ATCs.[5] Pangaea Health & Wellness, __ N.J. Super. at __ (slip op. at 7).

_____

[5] In 2011, pursuant to N.J.S.A. 24:6I-7(a), the Department issued an RFA to select the State's first six ATCs. These ATCs were to be "vertically integrated" (V-I); that is, they would need to cultivate, manufacture, and dispense medicinal marijuana, as this was the only permit type then provided for. A reviewing committee evaluated thirty-five applications and the Department chose two different high-scoring applicants for each of the three regions. Several disappointed applicants appealed, but we found the administrative proceedings were not arbitrary, capricious, or unreasonable. In re Instit. for Health Research and Abunda Life Ctr., No. A-0069-11 (App. Div. Aug. 22, 2013) (slip op. at 7-9).

In January 2018, Governor Murphy issued Executive Order 6, which directed the Department to review the Program with a goal toward expanding access to medicinal marijuana. To that end, in March 2018, the Department added five new conditions to the list of those qualifying for treatment, causing a rapid increase in qualified and registered patients.

To ensure adequate service to the growing population of qualified patients, the Department issued, on July 16, 2018, a second RFA to select six more entities for V-I ATC permits. After a committee scored all responsive applications – more than 100 – the Department chose six applicants on December 12, 2018. Recently, we agreed with the argument of several unsuccessful applicants that there were flaws in the process and remanded for further proceedings. Pangaea Health & Wellness, __ N.J. Super. at __ (slip op. at 17, 74).

II

The appeals now before us concern the RFA issued by the Department in July 2019. The Department rejected applications submitted electronically by appellants Tetra Grow LLC, Liberty Plant Sciences, LLC, Garden State

A-1272-19

Operations LLC, Cannwell LLC, Core Empowerment NJ LLC,[6] and Legendary Wellness, LLC, because the Department could not open attached files. The Department also rejected applications from appellants Impel Digital LLC, and Community Wellness of New Jersey LLC, because they were not timely submitted. And, the Department rejected the applications of appellants Progressive Treatment Solutions of New Jersey, Inc., ZY Labs, LLC, PG Health LLC, Marinus Holdings, LLC, and August Tenth Capital Investments, LLC, because they were found to be unresponsive on one or more RFA criteria. With one exception, we reject appellants' arguments.

The July 2019 RFA described the two parts of the application. Part A, titled "Mandatory Information," was presented as "a fillable PDF form that contains all the required information about the business entity that is applying for a permit."[7] The required information included: the applicant's

---

[6] The appeals of Tetra, Liberty Plant, Garden State, Cannwell, and Core Empowerment were consolidated. We will refer to these parties as "the consolidated appellants."

[7] The "Portable Document Format" (PDF) is an electronic file format used for documents. A PDF file may contain flat (un-editable) text and pictures, and it may also incorporate fillable (editable) fields that allow users to input information into designated boxes to complete forms. The completed form can then be saved or printed or both. See https://techterms.com/definition/pdf (last visited Feb. 4, 2021).

organizational documents; "evidence that the business entity is in good standing with the New Jersey Department of the Treasury"; a valid Business Registration Certificate; information about principal officers, directors, owners, and board members; a list of all persons or business entities having five percent or more ownership in the applicant entity; "[w]ritten verification of the approval of the community or governing body of the municipality in which the [ATC] . . . will be located"; "evidence of ownership or lease of the proposed site"; and evidence of compliance with local codes and ordinances.

Part B consisted of the "Scored Criteria" on which applicants would be judged. These criteria asked applicants to describe their proposed operations, experience, security and quality control plans, financing, and other aspects of running an ATC. Applicants were directed to file a PDF or printed document not exceeding 100 pages for each endorsement they sought, for Part B. V-I applicants were required to submit three Part B documents, one for each aspect of the V-I endorsement set.

The Department advised that applications could be "printed and filed manually" or submitted by way of the Department's "electronic submission method." Applicants were required to download a free program, Adobe Acrobat Reader, to fill out the Part A PDF form. The RFA provided a link to Adobe's

10

website where the program could be obtained.[8]  To complete Part A, applicants needed to fill in the editable fields on a PDF form provided by the Department, attach other PDF files to that form, and, if filing electronically, use the Department's submission website – created by using NoviSurvey software[9] – to submit its Part A PDF form, with attachments, and its Part B PDFs.

The PDF form to be used for Part A was originally created for the 2018 RFA using Adobe Acrobat Pro[10] and was updated in 2019 using the same software to reflect the criteria in the 2019 RFA.  The Department tested the form after the updates were made and discovered a minor issue with a function in the form that would allow applicants to add more space to answer longer questions. This problem was corrected shortly after the 2019 RFA was issued, and the

---

[8]  Adobe Acrobat Reader is a program which allows users to view, comment on, fill in, and sign PDFs.  See https://helpx.adobe.com/acrobat/faq.html#Basics (last visited Feb. 4, 2021).

[9]  NoviSurvey is a company that hosts online surveys on its website and offers software that can be used to create surveys on users' own websites.  These surveys may contain options to upload files.  See https://novisurvey.net/ (last visited Aug. 3, 2020); https://novisurvey.net/Survey-Software-Demos.aspx (last visited Aug. 3, 2020).

[10] Adobe Acrobat Pro is a paid version of Adobe's Acrobat software that offers more features than Acrobat Reader.

Department posted a notice informing prospective applicants of the need to download the updated, fixed form.

The RFA declared that "[f]or an application to be deemed responsive it shall include a full and complete response to each of the criteria specified, as well as completion and submission of all mandatory information. Failure to submit full, compete, and truthful information on the mandatory requirements may result in disqualification . . . ." Once received, applications would be "reviewed for completeness," as well as "truthfulness," to determine "whether an applicant passes or fails a particular requirement in the mandatory section." Part B would only be "reviewed and scored by a selection committee" once the application passed the examination for completeness and truthfulness.[11]

The deadline for submission of dispensary applications was set at 3:00 p.m., on August 21, 2019, and the deadline for cultivation and V-I applications was 3:00 p.m., on August 22, 2019. The RFA repeatedly stated that applications had to be timely submitted. Section III, "Eligibility," stated that applicants would "not be permitted to supplement applications after the application period closes." Section IV, "Application," declared that

---

[11] Our <u>Pangaea</u> decision dealt only with the manner in which the Department scored certain applications as to the Part B criteria. <u>See</u> __ N.J. Super. at __ (slip op. at 17-18).

> [t]he deadlines for receipt of application materials, which include the full application, [fee] checks and cover sheet, filed in response to this [RFA] are <u>absolute</u>. Only complete and timely received applications shall be reviewed. Applications received after the deadlines shall NOT be accepted.

Section V, "Application Submission and Review Schedule," stated that "[a]ny application received after the deadline shall not be reviewed by the Department." The Department could not have been clearer that the deadline was inviolate and that applications would not be eligible for review if submitted beyond that deadline.

To assist applicants, the Department conducted a "Pre-Application Webinar" on August 2, 2019, during which a Department representative explained that applications could be submitted online, or by a paper copy submitted by mail, courier, or hand delivery, so long as received by the deadline. He explained how applicants should fill out the Part A form, reiterating that applicants needed to use Adobe Acrobat Reader and describing how to use the "attach buttons" associated with some questions/criteria to attach required documents to the form. The representative also stated that the Department "recommend[ed] online submission," and characterized this as "the easiest way to fill out the forms . . . and submit just via the internet." He also emphasized that regardless of the submission method chosen, "applicants assume sole

responsibility for the complete effort involved in the application submission including . . . timely delivery" and "[a]ll applications must be received in accordance with the timelines set forth in the RFA."

In explaining the Part A requirement that applicants submit evidence of "municipal approval," the representative stated that the Department was "simply looking for some form of . . . documentation that the municipal government" in the location where the applicant planned to site its operation was "in favor of" a medicinal marijuana establishment "operating within that particular jurisdiction." This, he said, did not require final zoning approval from the municipality, but the Department wanted to "see a map or documentation of the ATC at its proposed location being [in] compliance with local ordinances." He further explained that to demonstrate "site control," applicants could submit "conditional letters of agreement or leases" for the property where they intended to locate and did not need "an actual signed lease" or "own the property," but the Department "need[ed] to know that [the applicant had] exclusive rights to that property" and "a lease or a purchase can be executed quickly."

The Department also answered questions via a "Frequently Asked Questions" (FAQ) link. Of relevance here, when asked whether an applicant needed to submit "written approval from the proposed location's municipality at

14

the time the application [is] submitted," the Department responded that "evidence of local approval [was a] requirement[] for this RFA" and that failure to demonstrate "mandatory information" about "site control" could result in rejection. The FAQ advised applicants to view the webinar, a recording of which was made available online, for more information.

Another question asked, "How does the applicant gain confidence that the electronically submitted application has, in fact, been received by [the Department] in its entirety as originally sent?" The Department responded:

> Applicants assume sole responsibility for the complete effort involved in the application submission. Allow plenty of time for the application submission process as applications received after the application period closes will not be considered. Following the submission deadlines, the Department will conduct a completeness review . . . . Applications will be rejected and not evaluated if received after the submission deadline.

On the deadline days, the Department monitored its online submission portal website to ensure it was functioning properly and to keep track of how many submissions for each type of permit had been filed. The Department did

15

not note any technical issues or system outages with the NoviSurvey portal[12] and received 196 timely applications.

## III

Appellants challenge final agency decisions memorializing that they, in some respect, failed to submit applications eligible for scoring. We group their arguments into three categories that formed the basis for their application's rejection; those that concern: (a) alleged electronic transmission problems and the failure to meet the filing deadline; (b) the question whether proof of community approval alone, without proof of governing municipal body approval, was sufficient to avoid disqualification; and (c) various other grounds.

## A

The consolidated appellants argue that the Department's decision to disqualify them was arbitrary, capricious, and unreasonable because of file corruption problems with required documents. They claim it was the Department's Part A PDF application form or its submission portal that "likely caused the corruption" and point to the fact that the Department had already re-

---

[12] One applicant contacted the Department on August 21, 2019, and stated that while attempting to file a cultivation permit application around 6:00 p.m., "the website crashed." The Department checked its NoviSurvey data and confirmed this applicant's electronic submission was received.

A-1272-19

released its Part A form once due to technological problems as evidence that it was not an issue or error on their end that led to file corruption.

Legendary Wellness, LLC, makes the same arguments, adding that it "tested all of [its attached files] before and after they were submitted" and that all "functioned properly," claiming this demonstrates the corruption was somehow caused by the Department. Impel Digital LLC, while not describing the alleged "technological problems" encountered when submitting its applications, similarly argues that the record supports its claim that these problems "rested with" the Department.

All these appellants also argue that the Department "failed to support its self-serving and conclusory statements" that the corruption was caused by applicants. They note that several applicants were disqualified based on corrupted certificates of good standing and business formation documents, which were "State-created documents," and they contend that the Department should not have relied on the Adobe technical support chat.

Our capacity to review agency actions is "limited." Pub. Serv. Elec. & Gas Co. v. N.J. Dep't of Envtl. Prot., 101 N.J. 95, 103 (1985); Pangaea Health & Wellness, __ N.J. Super. at __ (slip op. at 31). An agency's "final quasi-judicial decision" should be affirmed absent a "clear showing" that the decision

"is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." In re Herrmann, 192 N.J. 19, 27-28 (2007); Pangaea Health & Wellness, __ N.J. Super. at __ (slip op. at 31). Our review is restricted to three inquiries:

> (1) whether the agency action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings upon which the agency based [its] application of legislative policies; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors.
>
> [Pub. Serv. Elec. & Gas, 101 N.J. at 103.]

To be sure, "[t]he interest of justice . . . authorizes a reviewing court to abandon its traditional deference . . . when an agency's decision is manifestly mistaken," Outland v. Bd. of Trs. of the Teachers' Pension & Annuity Fund, 326 N.J. Super. 395, 400 (App. Div. 1999), but "a court may not substitute its own judgment for the agency's even though the court might have reached a different result," Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992); see also In re Carter, 191 N.J. 474, 483 (2007).

Our "strong inclination" is to "defer to agency action that is consistent with the legislative grant of power." Lower Main St. Assocs. v. N.J. Hous. & Mortg. Fin. Agency, 114 N.J. 226, 236 (1989). The presumption that an

agency's decision is reasonable "is even stronger when the agency has delegated discretion to determine the technical and special procedures to accomplish its task." In re Application of Holy Name Hosp. for a Certificate of Need, 301 N.J. Super. 282, 295 (App. Div. 1997). The Legislature's delegation of power to an agency is "construed liberally when the agency is concerned with the protection of the health and welfare of the public." Barone v. Dep't of Hum. Servs., 210 N.J. Super 276, 285 (App. Div. 1986).

We also typically defer to an administrative agency's "technical expertise, its superior knowledge of its subject matter area, and its fact-finding role." Messick v. Bd. of Rev., 420 N.J. Super 321, 325 (App. Div. 2011); Pangaea Health & Wellness, __ N.J. Super. at __ (slip op. at 32-33). This deference, however, "is only as compelling as is the expertise of the agency, and this generally only in technical matters which lie within its special competence." Application of Boardwalk Regency Corp. for a Casino License, 180 N.J. Super. 324, 333 (App. Div. 1981). We need not defer to an agency's findings beyond its area of expertise. Id. at 334; see also Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 588 (1988) (deferring to the expertise of the Division on Civil Rights when recognizing acts of discrimination but not to its findings on an employee's

diagnosis of alcoholism, which it was "no better able to evaluate . . . than is a reviewing court").

In applying these principles in this setting, we have recognized that the Department has the discretion to decide "whether the issuance of a permit to a particular applicant would be consistent with the purposes of the Act," and to determine "the kind and amount of information necessary to process permit applications." Natural Med., 428 N.J. Super. at 262-63. Adhering to this approach, we reject the arguments that the Department somehow acted arbitrarily, capriciously, or unreasonably in failing to excuse appellants' inability to timely file complete and uncorrupted applications. We examine some of their arguments individually.

Impel. The RFA required that applicants submit hard copies of certain documents, including an "application cover sheet," a "statement attesting to the accuracy, veracity, and completeness" of the information in the application, and application fee checks, regardless of whether they intended to submit the rest of their applications in electronic or printed format. Impel submitted these documents for applications for dispensary permits in the northern and southern regions on August 21, 2019, but, according to Impel, encountered technological problems when using the Department's online submission portal. Impel has not

A-1272-19

explained the nature of these problems, claiming only that it was unable "due to no fault of its own" to submit Parts A and B of its application by the deadline.

Community Wellness. Claiming it logged into the submission portal to "begin the process" of filing its application for a V-I permit in the central region at 11:58 a.m. on August 22, 2019, Community Wellness asserts it uploaded three Part B PDFs "with no problem." But it claims that as it prepared to upload its Part A form, to which it had already attached "most of" the required documents "the night before," it "discovered corrupt files" among those attachments that could not be opened by Adobe Acrobat Reader. Community Wellness described all its efforts to deal with these alleged problems.[13] Once it addressed or repaired its corrupted files, Community Wellness asserts that it had been "kicked off" the site and was then "unable to log back in."[14] As a result, a Community Wellness

---

[13] Community Wellness asserts that it rescanned paper copies of some of the corrupted documents to create "clean cop[ies] to reattach." For attachments that were fillable PDFs, Community Wellness alleges it encountered issues with Adobe Acrobat Reader "trying to merge documents together," causing the fillable boxes on one document to be filled with information from another. It then apparently examined and corrected these documents before printing, rescanning, and reattaching them to Part A. Even when it thought it had "caught" all the corrupted files, Community Wellness found more.

[14] The Department responds there was no "login function" on its portal website, only a "submission form where applicants could enter the date, upload files, and submit their applications."

 A-1272-19

representative drove a paper copy of its application to the Department's Trenton office. He arrived after the 3:00 p.m. filing deadline passed, and the Department refused to accept it.[15]

Five days later, Community Wellness wrote to the Department to explain the problems it had in trying to electronically file, suggested that the Department's website was "unstable" and it was "highly likely" other applicants were similarly affected, and requested an opportunity to submit a paper copy of its application. Two months later, having received no substantive response, Community Wellness requested that the Department stay its evaluation of applications and "reopen the RFA to allow any applicants who experienced technical difficulties . . . to resubmit." The Department denied the request, observing that the RFA, webinar, and FAQ had warned applicants that they

---

[15] Community Wellness argues that it "substantially complied" with the submission deadline because of the barely-late physical delivery after it was unable to electronically file and that this "minor or excusable deviation" from the deadline did not provide it with a competitive advantage over other applicants. It may be true, as is argued, that in our public-bidding cases we have excused bids that were minutes late because their belated submission constituted only a "technical violation" and did not give the late bidder a competitive advantage. See Turner Constr. Co. v. N.J. Transit Corp., 296 N.J. Super. 530, 533-35 (App. Div. 1997). But that determination was based on our construction of what the applicable statutory scheme permitted. There is nothing in the statutory scheme applicable here permitting the acceptance of a late application even when the tardiness was extremely brief.

"assume[d] sole responsibility" for submitting their applications on time. The Department took the position that applicants had the choice between paper and electronic submission and that both avenues were "simple" and "undemanding."

But the Department's investigation didn't stop there. After receiving Community Wellness's correspondence about its alleged technical difficulties, the Department "reviewed the application submission system and found no errors or issues with its functionality." It also noted that the "vast majority" of applicants experienced no file corruption and that "only some of the files" Community Wellness attempted to upload "were corrupted," leading it to conclude that any file corruption Community Wellness experienced was not caused by the Department's system. The Department also took the quite sensible and not unreasonable position that because Community Wellness waited until the deadline date to submit its application, it "should have had a contingency plan" in place in the event of "technical issues."

Consolidated Appellants. On August 21, 2019, Core Empowerment applied for a dispensary permit in the northern region, and Garden State applied for a dispensary permit in the central region and a cultivation permit in the northern region. On August 22, 2019, Liberty Plant applied for a V-I permit in the northern region, Tetra applied for a V-I permit in the southern region, and

23

Cannwell applied for a cultivation permit in the northern region. All these entities filed electronically and assert that they received confirmation from the website that their applications were "successfully submitted." They state that the site gave them "no opportunity to review" attachments to their Part A forms before submission and claim they were "not alerted to any technological problems with any of [their] application materials." On examining the applications of the consolidated appellants, the Department determined that attachments to Part A could not be opened.

Legendary Wellness. On August 21, 2019, Liberty Wellness applied for a V-I permit in the central region through electronic submission only because, it claims, the Department "encouraged" applicants to do so. Liberty Wellness also alleges that it "hired an individual that specialized in information technology" to prepare and submit its application and "tested all of the electronic files prior to submission." It received confirmation from the Department's website that its application was "successfully submitted." Like the situation with the consolidated appellants, the Department determined, on reviewing Liberty Wellness's application that Part A documents could not be opened. In

fact, the Department received a total of fifteen applications containing corrupted files that could not be opened.[16]

In light of all these assertions about corrupted applications, the Department referred the matter to its Office of Health Information Technology (HIT) "to determine whether . . . [the files] could be fixed, and whether . . . the file corruption was caused by the submission process." HIT reviewed the submission website and its records from the two deadline dates but found no errors or functionality problems. HIT also attempted to open the files in question to determine the cause of the corruption but found they were completely inaccessible. It found, however, that the affected files' "raw data" did not "start with '%PDF'" as they should have. In attempting to replicate the problem, HIT found that the NoviSurvey portal was "incapable of causing the type of corruption seen in the files" because if it had caused the corruption "all of the [applicants'] files would be corrupted/inaccessible, not only the Part A attachments." HIT ultimately concluded that "[w]hatever tool [applicants] used before adding [the affected documents] . . . corrupted them before they were attached."

---

[16] Six of the applicants whose submissions contained corrupted files also timely submitted paper copies of their applications. As a result, review of their applications was not hampered.

25

The Department also contacted Adobe's technical support for assistance. At Adobe's request, the Department provided one of the corrupted PDF attachment files for examination. An Adobe representative analyzed the file and found it could never be recovered, opened, and reviewed, and that the file itself did not "contain any information on how it got corrupted." The Adobe representative explained that "[t]here could be many reasons for [file corruption]," the "most common is the involvement of [third] party PDF [programs]," and that it was "difficult to find the root cause of the problem."

The Department also learned that Tetra had submitted some attachments to its Part A form as ZIP files,[17] which are not supported by Adobe and cannot be opened if attached to a PDF created using an Adobe product.[18] A HIT employee was able to "override the Adobe settings" to allow ZIP files to be

---

[17] ZIP is a file format that compresses data to reduce the "size" of electronic files. A ZIP "file" contains one or more separate compressed files such as documents or pictures. These files may then be "unzipped" from the ZIP file, restoring them to their full size and allowing them to be opened. See https://techterms.com/definition/zip (last visited Feb. 4, 2021).

[18] Adobe's website lists ZIP files among those file types that are "blacklisted" from Acrobat, meaning they "can be attached" to PDFs in Acrobat but "cannot be saved or opened." See https://www.adobe.com/devnet-docs/acrobatetk/tools/AppSec/attachments.html (last visited Feb. 5, 2021).

26

opened but found that six of Tetra's ZIP files were "corrupted and [couldn't] be opened."

After completing its investigation, the Department concluded that its website did not cause the corruption in the affected application. In an internal memorandum, the Department stated that this determination was based on the facts that: the great majority of applications did not contain corrupt files; even affected applicants did not have all of their attachments corrupted; there was "no evidence of problems with the online submission portal, no evidence of outages, and the system itself was determined to be incapable of causing the type of file corruption present in the Part A files"; and the Part A form and website "were tested and found reliable prior to the submission deadlines." The Department also noted that HIT had concluded the corruption was "caused by the end-user (whether knowingly or not)," "prior to submission."

The Department stated in its memorandum that "[t]he applicants affected by the file corruption had both the opportunity to submit in paper and/or to contact the Department prior to the deadline to troubleshoot any technical issues," but not one reported problems with the website on the two deadline days. The Department also noted that it had explained in the RFA "what software should be used to achieve successful results with the Part A form" and

27

had "provided a mechanism for applicants to submit technical questions and issues prior to the deadline." It concluded that "allow[ing] the affected applicants to re-submit after the deadline would [give] them more time and potentially [give] them an unfair advantage." As a result, the Department disqualified these applicants.

The Department's response to these arguments was reasonable and the conclusions it reached, in disqualifying appellants, were by no means arbitrary, capricious, or unreasonable. The Department relied on HIT's research into the file corruption and its conclusions that the NoviSurvey website could not have caused that type of corruption, as well as the logical conclusion that if its portal was capable of corrupting files, it would have corrupted all the affected applicants' files, not just some. The Department considered the fact that the files of a non-appellant, which used a flash drive instead of the website, were corrupted and that Community Wellness experienced corruption issues before trying to use the website to upload its Part A. The Department also relied on assistance from Adobe, the maker of the program used to create the Part A form, to determine the cause of the corruption and learned that corruption could have been caused by "third-party" user error.

We are particularly mindful that the RFA repeatedly stated that submission deadlines were "absolute" and that failure to submit a complete application by the relevant deadline would result in disqualification. The webinar and FAQ document also advised that applicants took on full responsibility for submitting timely applications. Tellingly, the Department responded to a question about how applicants could "gain confidence" that an application had been received "in its entirety as originally sent," by repeating that applicants "assume sole responsibility for the complete effort involved in the application submission," thereby conveying that any difficulties with electronic submission would not excuse lateness or incompleteness.

As we held in another case concerning the Program, our "authority to compel agency action" should be "exercised sparingly, as courts are ill-equipped to micromanage an agency's activities." Caporusso v. N.J. Dep't of Health & Senior Serv., 434 N.J. Super. 88, 101 (App. Div. 2014). In this regard, we held that courts could not "compel [the Department] to exercise its discretion in a specific manner with respect to the discretionary agency review granted by the Act." Id. at 107. In adhering to this approach, we find nothing inappropriate in the Department's creation and adherence to a hard-and-fast deadline, and we find nothing arbitrary, capricious, or unreasonable in either the manner in which the

29

Department investigated or considered the problems these appellants alleged or in the Department's refusal to extend any relief.

B

Progressive Treatment Solutions of New Jersey, Inc., Marinus Holdings, LLC, ZY Labs, and August Tenth Capital Investments, LLC, argue that the Department improperly disqualified their applications based on a lack of documentation in their Part A submissions about municipal support. These arguments incorporate assertions that the Department mistakenly interpreted N.J.A.C. 8:64-7.1(b)(2)(x) – requiring the inclusion of "[w]ritten verification of the approval of the community or governing body of the municipality in which the [ATC] is or will be located" – too narrowly. Progressive also argues that the Department's interpretation of that regulation constituted improper rulemaking. ZY Labs additionally argues that if the interpretation is correct, the Department has not adhered to it in the past when it chose successful applications containing support letters from the mayors of municipalities with a "mayor-council" form of government. We note these appellants' specific allegations on this point:

- Progressive asserts that it complied with N.J.A.C. 8:64-7.1(b)(2)(x) and the RFA by attaching letters from "respected members of the community" in Edison to its Part B submission and that the Department erred by not considering the

30

attachments to Part B when evaluating its application for completeness, contending that applicants were not given "any advance warning" that applications would "not be treated as . . . integrated document[s]."

- ZY Labs argues its application was complete because it included supporting letters from Hillside community members in its Part A submission.

- Marinus argues that the Binding Option to Lease it entered with Fifth New Jersey Corporation constituted "written approval of the community" because Fifth's president "owns property in Maple Shade Township and, therefore . . . is a member of the local community."

- August Tenth argues that its inclusion in its Part B of the amended Green Township ordinance and an explanatory news article satisfied the Part A criterion.

We defer to an agency's interpretation of a regulation "within the sphere of [its] authority" unless the interpretation is "plainly unreasonable" because "a state agency brings experience and specialized knowledge to its task of administering and regulating a legislative enactment within its field of expertise." In re Election Law Enf't Comm'n Advisory Op. No. 01-2008, 201 N.J. 254, 262 (2010).

31

Courts interpret regulations in the same manner as statutes. In re Eastwick Coll. LPN-to-RN Bridge Program, 225 N.J. 533, 542 (2016). The "paramount goal" is ascertaining the regulator's intent, which is generally found in the regulation's "actual language." U.S. Bank, N.A. v. Hough, 210 N.J. 187, 199 (2012). The words of a regulation should be given "their ordinary and commonsense meaning," Election Law Enf't, 201 N.J. at 263, and courts should presume that the drafter "intended the words it chose and the plain and ordinary meaning ascribed to those words," Paff v. Galloway Twp., 229 N.J. 340, 353 (2017).

Courts should also view a regulation's words in the context of the entire regulatory scheme of which it is a part, State v. Twiggs, 233 N.J. 513, 532-33 (2018), and make every effort "to avoid rendering any part of the [regulation] superfluous," State in Interest of K.O., 217 N.J. 83, 91 (2014). In other words, courts must "presume that every word . . . has meaning and is not mere surplusage," and "must give those words effect and not render them a nullity." In re Attorney Gen.'s "Directive on Exit Polling: Media & Non-Partisan Pub. Int. Grps.", 200 N.J. 283, 298 (2009); see also Seigel v. N.J. Dep't of Envtl. Prot., 395 N.J. Super. 604, 618-19 (App. Div. 2007) (rejecting agency's interpretation of a regulation because it "fail[ed] to give adequate meaning to all

the terms" therein); <u>Twp. of Pemberton v. Berardi</u>, 378 N.J. Super. 430, 443-46 (App. Div. 2005) (rejecting town's and trial court's interpretation that would, "in effect, read the second sentence out of" a statute).

Because the purpose of a regulatory analysis is "to determine [its] true intention," the words chosen by the regulator "are to be made responsive to the essential purpose of the law." <u>Jimenez v. Baglieri</u>, 152 N.J. 337, 351 (1998). And yet, "it is not [the court's] function to 'rewrite a plainly-written enactment,' or to presume that the drafter intended a meaning other than the one 'expressed by way of the plain language.'" <u>U.S. Bank</u>, 210 N.J. at 199 (quoting <u>DiProspero v. Penn</u>, 183 N.J. 477, 492 (2005)). Courts must not "rearrange the wording of the regulation, if it is otherwise unambiguous, or engage in conjecture that will subvert its plain meaning." <u>Ibid.</u> And courts "cannot insert qualifications into a statute or regulation that are not evident by the enactment's language." <u>Id.</u> at 202.

In short, if a regulation's language is clear, "the interpretative process will end without resort to extrinsic sources." <u>Bedford v. Riello</u>, 195 N.J. 210, 222 (2008). But, if "the plain language analysis yield[s] more than one plausible interpretation of the regulation, a reviewing court may consider extrinsic sources." <u>Eastwick Coll.</u>, 225 N.J. at 542. A court may also turn to extrinsic

evidence "if a literal reading . . . would yield an absurd result, particularly one at odds with the overall [regulatory] scheme." Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 572 (2012).[19]

The information required by N.J.A.C. 8:64-7.1(b)(2)(x) is proof of "the approval of the community or governing body of the municipality in which the [ATC] is or will be located." Failure to provide this verification, as with failure to present any "requested information," "shall result in a decision to not accept the application for processing." N.J.A.C. 8:64-7.1(c). These and other related regulations do not elaborate on what is meant by "the approval of the community or governing body of the municipality."

In reviewing this specific regulation, we do not hesitate to conclude that its plain meaning is that proof of approval may come from either the community "or" the municipality's governing body. Typically, the word "or" in a statute or regulation is considered a disjunctive particle indicating the words or phrases it connects are alternatives. In re Est. of Fisher, 443 N.J. Super. 180, 192 (App.

---

[19] Appropriate outside sources include the "long-standing meaning ascribed to the language by the agency charged with its enforcement," Bedford, 195 N.J. at 222, or the regulation's drafting history, Twiggs, 233 N.J. at 533. The goal of interpretation remains to "ascertain the fundamental purpose underlying the language" used by the agency when drafting the regulation. Gallenthin Realty Dev., Inc. v. Borough of Paulsboro, 191 N.J. 344, 359 (2006).

Div. 2015). In some instances, "or" may "introduce an appositive," that is, "a word or phrase that is synonymous with what precedes it." United States v. Woods, 571 U.S. 31, 45 (2013). In Gallenthin, 191 N.J. at 368, the Court interpreted the statutory phrase "stagnant or not fully productive" in a manner where "not fully productive" was an "elaborati[on] on" "stagnant," rather than an "alternative criteri[on]." But, in ordinary use, words connected by "or" are to "be given separate meanings." Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979). For example, in one case, we found that a statute compelling compliance from "[a]n owner or person having control of a reservoir or dam" created four groups: "(1) dam owners; (2) reservoir owners; (3) those who control the dam; and (4) those who control the reservoir." N.J. Dep't of Envtl. Prot. v. Alloway Twp., 438 N.J. Super. 501, 512 (App. Div. 2015).

These appellants claim they satisfied N.J.A.C. 8:64-7.1(b)(2)(x) by providing documentation of "community" approval in the municipalities where they proposed to locate. The word "community" is commonly understood as broadly as a "neighborhood, vicinity or location" or slightly less broad as a "society or group of people with similar rights or interests." Black's Law Dictionary (11th ed. 2019) 349. Because, as contained in the regulation in question, "community" is modified by the phrase "of the municipality in which

A-1272-19

the [ATC] is or will be located," the most appropriate "ordinary and commonsense meaning" for the word appears to be those individuals populating a place, namely that municipality. We decline the invitation to adopt a strained view of the word "community" to render it is synonymous with "governing body."

In short, we find N.J.A.C. 8:64-7.1(b)(2)(x) to be unambiguous, and its plain language allows for an applicant's submission of documentation of the support of members of the community or the municipality's governing body. This interpretation not only attributes to the regulation its ordinary, common meaning but also ensures that no part of the regulation is rendered superfluous or ineffective. We also note that the RFA contained the exact same language as the regulation, revealing that the Department intended applicants to comply with the regulation's terms, not some other unrevealed meaning. Although the Department claims it has been applying its own narrower interpretation of the regulation for some time, when an agency's interpretation of a regulation conflicts with the plain meaning of the language used, a court "should not hesitate to reject it." Safeway Trails, Inc. v. Furman, 41 N.J. 467, 483 (1964). We conclude that the regulation plainly permits proof of community approval alone, that this meaning was conveyed in the RFA, and that these appellants are

entitled to the benefit of this interpretation, not the narrower interpretation now urged by the Department.[20]

ZY Labs. In applying this interpretation, we conclude that ZY Labs satisfied the Part A criterion by including letters from three prominent community members in Part A of its application. Those letters may not conclusively demonstrate that Hillside's municipal government would allow an ATC in its jurisdiction, but ZY Lab's response met the requirements of the plain language of the regulation. The Department's contrary conclusion, and its disqualification of ZY Labs, was therefore arbitrary, capricious, and unreasonable.

Progressive. Progressive's position is different. Its Part A submission included only a proposed host-community agreement that was signed only by Progressive; no Edison representative had actually signed it. Thus, it did not submit any true verification of either community or municipal governing body support in Part A. In Part B, however, Progressive included approval letters from community members comparable to those submitted by ZY Labs.

---

[20] In light of this holding, we need not consider or discuss whether the application of the narrow interpretation espoused by the Department constitutes improper rulemaking.

Progressive argues that it took this approach because it was concerned about including "superfluous" documents in Part A. We reject this argument.

The RFA stated that applications would be "reviewed for completeness." Part A was titled "Mandatory Information" and the RFA stated that, for Part A, "applicants shall answer each question in full and to the best of their ability." It also warned applicants that they may be disqualified when submitting "incomplete" information in Part A. It was only <u>after</u> the completeness review that Part B would be scored. In short, the Department fully informed applicants that they must include anything responsive to Part A with their Part A submissions. It was not arbitrary, capricious, or unreasonable for the Department to consider only documents in Part A when determining whether Progressive satisfied all Part A criteria.

<u>Marinus</u>. As to the requirement of Part A that it submit proof of community or municipal approval, Marinus checked "No." It now claims that it satisfied this criterion by submitting a binding option to lease property in Maple Shade, and with a lessor who owns property in the community and is willing to lease it for use as an ATC. Even if we were to look beyond the "No" response, we would reject the argument that a single private property owner's approval meets the requirement of "community" support.

August Tenth.  Like Marinus, August Tenth also checked "No" in response to the community or municipal government approval question and admitted in both Part A of its application and its brief that it did not seek approval from any municipality.  Even if the Department was required to look further – we have concluded it wasn't – August Tenth named two proposed properties in Vernon Township but included an ordinance and news article from Green Township.  It did not identify any property in Green Township, and stated only that it would use its "best efforts" to find a site there.  As a result, the Green Township-related documents did not constitute "[w]ritten verification of the approval of the community or governing body of the municipality in which the [ATC] is or will be located" as required by N.J.A.C. 8:64-7.1(b)(2)(x) and the RFA.

To conclude, we hold that ZY Labs should not have been disqualified, but we reject the similar arguments of Progressive, Marinus, and August Tenth.

C

We lastly consider a few other issues unique to certain appellants.

PG Health.  PG Health argues that the Department erred by finding its application was unresponsive to the criterion requiring applicants to provide evidence of ownership or lease of their proposed site or sites of operation, and that it also erred by failing to explain its decision in adequate detail to allow for

appellate review.  PG Health further argues that the RFA criterion was impermissibly vague and that it fully responded to the criterion by submitting a letter of intent between itself and the owner of one of its proposed sites and a letter from the Borough of Glassboro concerning the other.  In essence, PG Health claims it is unreasonable for the Department to require an applicant to close on the sale of a proposed property before being chosen for a permit and that what it provided was sufficient.

While sparse, the final agency decision was adequate for appellate review. Administrative agencies must "articulate the standards and principles that govern their discretionary decisions in as much detail as possible." Van Holten Grp. v. Elizabethtown Water Co., 121 N.J. 48, 67 (1990); see also R&R Mktg., LLC v. Brown-Forman Corp., 158 N.J. 170, 178 (1999); Pangaea Health & Wellness, __ N.J. Super. at __ (slip op. at 35-36).  Agencies must make findings "to the extent required by statute or regulation, and provide notice of those [findings] to all interested parties." Matter of Issuance of a Permit by Dep't of Envtl. Prot. to Ciba-Geigy Corp., 120 N.J. 164, 173 (1990).  If the absence of critical findings hinders effective appellate review, remand may be appropriate. Ibid.

Nevertheless, "[a]ll of the evidential data" before an agency "need not be repeated or even summarized, nor need every contention be exhaustively treated." Application of Howard Sav. Inst. of Newark, 32 N.J. 29, 53 (1960). A decision "is sufficient if it can be determined from the document without question or doubt what facts and factors led to the ultimate conclusions reached." Ibid. Even when an agency's findings are not as "full and well organized" as they could be, if the court can "understand fully the meaning of the decision and the reasons for it," there is "no sufficient reason" to remand. Ibid.

The final agency decision stated that PG Health's application was disqualified because it was not responsive to a mandatory criterion in Part A, namely evidence of ownership or lease of the properties where PG Health planned to operate. The Department did not explain in detail why it felt PG Health's materials did not satisfy this requirement, but the record on appeal includes those materials, the RFA containing the criterion, and the FAQ and webinar that further discussed what would suffice. The lack of more specific factual findings in the Department's final agency decision does not hinder our review.

We also reject the argument that the RFA criterion was inappropriately vague. Although public contracting law is not binding on RFA proceedings

41

under the Compassionate Use Act, the general requirement that agencies conduct bidding procedures in a manner that places prospective bidders "on an equal competitive level" is likewise important in the context of the Program. Donald S. Hubsch Co. v. Sullivan, 47 N.J. 556, 559 (1966). As a result, the Department's determination, as adequately explained in a final agency decision, must be reached in a way that ensures a "common standard of competition." Hillside Twp. v. Sternin, 25 N.J. 317, 323 (1957). As with requests for proposals under the public contracting laws, criteria for ATC RFAs should be "as definite, precise and full as practicable in view of the character" of the services to be provided to the public as part of the Program. Pangaea Health & Wellness, __ N.J. Super. at __ (slip op. at 53) (quoting James Petrozello Co. v. Twp. of Chatham, 75 N.J. Super. 173, 178 (App. Div. 1962)).

The RFA in question put applicants on notice of the information they were required to include within their Part A submissions. Although the RFA did not specifically detail for applicants every possible statement or document that would satisfy the Part A criteria, this did not make those criteria so "vague" that the average reader would not understand what information was being requested. Part A stated that applicants needed to submit "evidence of ownership or lease of the proposed site." The Department provided further clarification in its

webinar that "an actual signed lease" or actual ownership was unnecessary and "conditional letters of agreement or leases" could suffice, but that the applicant would need to demonstrate that it had "exclusive rights" to the property or properties and that a lease or purchase could be "executed quickly." And the Department stated in its FAQ that failure to demonstrate "site control" could result in disqualification. We are satisfied that the criterion was explained in sufficient detail in the RFA and other communications and that PG Health's disqualification based on a failure to comply was not arbitrary, capricious, or unreasonable on vagueness grounds.

We also conclude that the Department's decision to reject PG Health's application was supported by the record. PG Health's "Letter of Intent to Purchase" for the Delsea Drive site explicitly stated it was not binding. Whether this letter constituted a sufficient "conditional letter of agreement" as mentioned in the webinar or merely conveyed that the parties would "act in good faith" to negotiate a binding purchase agreement later, is debatable. But PG Health's application revealed that it lacked evidence of site control for its proposed cultivation facility. Its letter from Glassboro stated only that the municipality was "willing to work with" PG Health to "identify property the Borough owns in the O[ffice] P[ark] Zoning District" that could be used for such a facility. PG

43

Health admits that Glassboro would not offer any specific property unless PG Health was chosen for a permit. As a result, while identifying a "desirable" lot within the mentioned district, PG Health did not present evidence that it had exclusive rights to that lot or any other or that it would be able to execute a lease or purchase from Glassboro quickly after award. Considering these circumstances, we cannot conclude that the Department acted arbitrarily, capriciously, or unreasonably in disqualifying PG Health's application.

Marinus. Marinus argues that the Department erred by finding that its application was missing evidence of compliance with local ordinances in the municipality where it planned to locate its dispensary, claiming that "even the most cursory review" of the aerial map it provided of its proposed location would "readily reveal" that the dispensary would be "at least one (1) mile away from" the nearest school and that "any internet search" would confirm this. Marinus also argues that its opinion letter from a land-use attorney demonstrated its compliance with local ordinances. Although we need not consider this argument because Marinus was properly disqualified for other reasons, we deem it helpful to the administration of the Program to opine on this issue.

We conclude that the Department did not err in disqualifying Marinus on this ground. The version of the map Marinus provided depicted the closest

school to the proposed dispensary but in no way differentiated it from other landmarks and addresses Google marked on the map. Moreover, the map did not state the distance from the dispensary to the school, nor did the application mention whether any places of worship or other places affected by local ordinances were nearby, or even what any ordinances may have required.

In addition, the land-use attorney's letter stated only an opinion that a marijuana dispensary was not a prohibited use in the zone where Marinus intended to operate and that there was "a good chance" the Maple Shade governing body could be "convince[d]" to allow that use. The letter admitted that a previous attempt to site an ATC near Marinus's proposed address failed when Maple Shade denied a variance. Thus, the land-use attorney did not state definitively that Marinus's chosen location complied with local ordinances. For these reasons, we cannot conclude that the Department's decision in this regard was arbitrary, capricious, or unreasonable.

Consolidated Appellants. Arguing the Department erred by not providing "any form of administrative review" before disqualifying them, the consolidated appellants assert that they were improperly denied an opportunity to "submit materials proven to be uncorrupted, to offer an explanation for the purportedly corrupt files, or otherwise establish facts or provide legal authority supporting a

challenge to" the Department's decision to disqualify them, which deprived them of any "meaningful review process." They argue that the lack of an administrative proceeding has deprived them of a sufficient record for proper appellate review.[21] We reject this argument.

The Administrative Procedure Act, N.J.S.A. 52:14B-1 to -31, does not create a substantive right to an administrative hearing. In re Fanelli, 174 N.J. 165, 172 (2002). Instead, the right to a hearing must be granted by another statute or constitutional provision. Ibid. The Compassionate Use Act does not grant that right. N.J.S.A. 24:6I-7(e) provides only that the denial of an application to operate an ATC "shall be considered a final agency decision, subject to review by the Appellate Division" without providing additional processes, although we intervened in the unique circumstances described in our recent decision regarding Part B scoring for the sake of instilling public confidence in the Department's processes. Pangaea Health & Wellness, __ N.J. Super. at __ (slip op. at 47-48). We find the circumstances here quite different. The Department was neither judging nor scoring the information provided by these appellants; it was merely determining whether appellants submitted the information required by Part A.

---

[21] Marinus and Impel make the same argument.

Consequently, we conclude that the Department was not required to initiate or engage in any further procedures to address challenges by disappointed applicants like appellants.

August Tenth.  In raising concerns about the Department's overall administration of the Program, August Tenth argues that the needs of the growing number of qualified patients are not being met and the Program has not expanded at a sufficient pace.  It claims the Department is "strictly bound to adhere to current statute[s] and regulations" and is "valiantly trying under difficult political circumstances" but contends the "shortage" of medicinal marijuana must be addressed.

In August Tenth's view, the RFA process itself is "flawed," and applicants should be "given the opportunity to prove [their] worth . . . under real-time business conditions."  August Tenth complains that the RFA procedures to date have led to "bald-faced discrimination against actual New Jersey residents clearly in favor of large multi[-]state 'big Marijuana' corporations by limiting the number of licenses."  It also alleges that the Legislature has prevented the expansion of the Program by not filling the membership of the new Cannabis Regulatory Commission created by the amended Act in July 2019.

August Tenth argues that the proper "remedy" for all these concerns is to "expand the number of licenses available" and that "the restoration of the 'chance' at a 'fair' competition" by simply being "thrown back in the pot" of applicants for scoring is "not the correct remedy." Instead it argues, among other things, that all 196 RFA applicants – including those like August Tenth that were disqualified as nonresponsive to one or more Part A criteria – should be granted. While admitting "[t]here is much work to be done" before it could begin a cultivation operation and conceding it "has no illusions as to the score that would have been received" from the Department had it not been disqualified, August Tenth nevertheless demands that it receive "some element of permit 'approval'" so it may grow marijuana with the benefit of the "exemption from State criminal and civil penalties."

These arguments reveal a studied indifference to the separation of powers and the extent to which a court may be asked to upset or undo decisions of an administrative agency. In making these arguments, August Tenth is not asking us to review the validity of any rule or to assess any other specific action taken by the Department or any other agency. August Tenth is simply quarreling with what it deems the improper actions or inactions of the executive and legislative

48

branches; this is nothing but a non-justiciable political diatribe to which we will not respond.

\* \* \*

To summarize, we reverse the final agency decision rendered by the Department as to ZY Labs' application, and remand that matter (A-1747-19) to the Department for further proceedings; we do not retain jurisdiction in that matter. As to all the other appeals, we affirm the final agency decisions under review.[22] The stay previously entered by this court is hereby vacated.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[22] The court has found that any other arguments not specifically addressed have insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).